636 So.2d 1033 (1994)
Octave ORGERON
v.
Henry David PRESCOTT, Jr. and State Farm Mutual Automobile Insurance Company.
No. 93-CA-926.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1994.
Rehearing Denied June 17, 1994.
*1036 Brien J. Fricke, Patrick C. McGinity, New Orleans, for plaintiff/appellee.
David V. Batt, Metairie, for defendant/appellant.
Brent M. Maggio, Metairie, W. Paul Wilkins, New Orleans, for defendant/appellee.
Before KLIEBERT, BOWES and WICKER, JJ.
WICKER, Judge.
This lawsuit arises out of a June 22, 1987 collision between automobiles driven by plaintiff Octave Orgeron and defendant Henry Prescott, Sr., in which Prescott's car struck Orgeron's car in the rear. Orgeron sued Prescott and his insurer, State Farm, claiming injuries to his neck, lower back, and knees. Orgeron's employer, Harry Lee, Sheriff of Jefferson Parish, filed an intervention to recover for medical expenses and lost time wages paid to Orgeron. Following trial, a jury rendered a verdict in favor of Orgeron in the amount of $10,000 in general damages, without awarding any special damages, but found plaintiff to be 75% at fault and Prescott to be 25% at fault, making the net award $2,500. The jury made no award to the intervenor.
Plaintiff moved for judgment notwithstanding the verdict, which was granted by the trial court. The judge increased the general damages award to $35,000, awarded past medical expenses in the amount of $940 and future medical expenses of $70,000, and reapportioned the comparative fault of the parties, finding both plaintiff and defendant to be 50% at fault. Thus, the net judgment rendered for plaintiff pursuant to the JNOV was in the amount of $52,970. In addition, the court awarded the intervenor reimbursement for $7,992.80 in medical expenses and lost income paid on behalf of the plaintiff.
From that judgment defendants have appealed. Plaintiff has answered the appeal, asserting that defendant should have been found 100% at fault. We amend and affirm the judgment, as set forth below.

ISSUES ON APPEAL
Defendants raise numerous issues on appeal. They contend that the trial court erred (1) in ignoring the jury's assessment of fault at 75% to the plaintiff and 25% to the defendants and reapportioning fault at 50% to the plaintiff and 50% to the defendant; (2) in increasing plaintiff's pain and suffering award from $10,000 to $35,000; (3) in awarding plaintiff $70,000 in future medicals; (4) in awarding $940 in past medical to plaintiff; (5) in awarding intervenor, Sheriff Harry Lee, $7,992.80; and (6) in failing to reduce the intervenor's award by the percentage of fault assigned to the plaintiff.
In reviewing a JNOV, an appellate court must be guided by the following principles:
"A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied.... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or *1037 factual questions should be resolved in favor of the non-moving party."
Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991).
In reviewing a JNOV, the appellate court employs the same criteria to determine whether the trial court erred in granting the JNOV. If the appellate court finds that reasonable men in the exercise of impartial judgment might reach a different conclusion, then the trial court erred in granting the motion and the jury verdict must be reinstated. Id.
Accordingly, we must evaluate the evidence elicited at trial in light of these precepts.

EVIDENCE
The evidence established that Orgeron, a 28-year-old narcotics detective with the Jefferson Parish Sheriff's Office, was driving an unmarked police vehicle and was in the course of his duties at the time of the accident. Orgeron and another detective were following a suspect in a narcotics investigation, driving eastward on Airline Highway at its intersection with Causeway Boulevard, where Airline dips down to pass under the Causeway traffic circle and the Kansas City Southern railroad trestle. Orgeron testified the suspect was driving at about 20 miles per hour and that Orgeron was travelling at the same speed.
Orgeron and the other officer were planning to stop the suspect by boxing him in, a technique in which one police vehicle gets in front of the suspect's car and the other police vehicle gets behind it and, as the suspect's car approaches the preceding vehicle, the following vehicle stays close behind to keep the suspect's car in place. The officers intended to pull the suspect over after clearing the underpass, somewhere past Labarre Road and Airline Highway, the first intersection after the underpass.
After beginning the descent into the underpass, in the right lane of traffic, Orgeron's vehicle was struck from behind by Prescott's vehicle, knocking Orgeron's car some 81 feet forward into the suspect's vehicle. As a result of the impact, Orgeron's knees were driven into the dashboard and he was whipped backward with sufficient force to break the mountings on his seat and knocked him flat on his back.
Prescott, who was 81 years old at the time of the accident, died prior to the trial; accordingly, his discovery deposition was read into evidence as his testimony. Prescott testified that he was heading east on Airline Highway, in the right lane of traffic, and stopped at the traffic light at Airline and Severn. After the light changed he proceeded forward toward the underpass. He saw a string of four cars moving along ahead of him and he looked to the left to see if he could pass them, but he could not change lanes because of oncoming traffic. Then he hit the car ahead of him.
Prescott first stated his speed was 25 miles an hour when he hit Orgeron's car, but later said he could not have been going more than five miles an hour. He said that Orgeron's car was moving at "average speed" and that Orgeron's car was moving when he hit him. Later, however, he stated that the cars in front of him stopped abruptly, although he admitted he saw no brake lights at any time. He said he reached the conclusion that Orgeron had stopped abruptly "[b]ecause I didn't have enough room to avoid hitting him." Prescott also stated that he slammed on his brakes, but was unable to stop in time to avoid hitting Orgeron's car.
Prescott denied making any statements to the investigating officer or to anyone else on the scene, and denied suffering any injury in the accident. He denied telling the officer who investigated the accident that he saw Orgeron's car slowing down. Finally, Prescott stated he had been driving since 1930 and this was the first accident he had ever been in.
The investigating officer, Lieutenant Gary Bordelon, stated that Prescott told him he attempted to move from the right lane to the left lane because the vehicles in front of him were slowing down and that he hit the car when trying to go around it. Prescott also told Bordelon he was travelling about 40 miles per hour. In addition, Bordelon said, *1038 Prescott had cut one of his fingers during the accident, but refused treatment at the scene.
Lieutenant Bordelon, who testified as an expert in accident investigation, stated there were no skid marks anywhere at the accident site that would indicate any of the parties applied their brakes. Bordelon said that the force of the collision pushed Orgeron's car 81 feet from the point of impact, indicating not only that there was no braking, but also that the accident took place at a speed of about 40 miles per hour. Prescott's car moved about 15 feet from the point of impact. The speed limit is 40 m.p.h. at that point on Airline Highway.
Bordelon testified that due to the downward slant of the roadway at the underpass, there is some visual impairment to drivers approaching the underpass. In Bordelon's expert opinion, however, the cause of the accident was Prescott's inattentiveness while attempting to change lanes.
Sergeant William Grieff, who was working with Orgeron at the time of the accident, was driving the vehicle preceding the drug suspect's vehicle. Grieff was keeping a close eye on the suspect and on Orgeron in his rear view mirror, as is necessary for a boxing-in maneuver. He testified that he was moving about 40 m.p.h. and that both the suspect and Orgeron, who was following the suspect, were moving with the flow of traffic, about 35-40 m.p.h. None of the vehicles stopped prior to the accident. Grieff testified that after the collision he ran back to Orgeron's car and saw that Orgeron had been knocked flat on his back when the seat broke, due to the force of the impact.
Octave Orgeron is a large man, six feet four-and-one-half inches tall, who weighed 280 pounds at the time of the accident. By the time of trial he weighed 345 pounds. He testified that he had no problems whatsoever with his knees prior to the accident, but that since the accident his formerly athletic lifestyle had changed greatly. Although he was still able to perform his job duties as a narcotics investigator, he was unable to pursue his favorite leisure activities, including running, long physical work-outs at the gym, and other sports.
He attributed his weight increase to depression because he no longer can do the things he used to do. In addition, he realized that eventually his knee problem will become so severe he will have to request reassignment to a desk job, which his doctor had already told him to do. Orgeron stated that his job is everything to him and he wants to remain a narcotics investigator, but assignment to a desk job will take him off the narcotics squad.
A few days after the accident Orgeron was examined by Dr. Rodney Huddleston, a specialist in internal medicine, who testified at trial as an expert in that field. Dr. Huddleston stated Orgeron suffered bruises and swelling to the knees and musculoskeletal injuries to the lumbosacral and thoracic spine as a result of the accident. He treated Orgeron over a four-month period, but eventually advised him to consult an orthopedic surgeon when his knee injuries persisted.
Dr. Ralph Gessner, who testified as an expert in orthopedic surgery, stated he first saw Orgeron on September 23, 1987 and treated him thereafter for injury to his right knee. Dr. Gessner's examination revealed contusions in both knees and patellar chondromalacia in the right knee. He noted mild degenerative (arthritic) changes in Orgeron's knee, which he said result in everyone from aging and wear-and-tear on the body, but stated those had been asymptomatic until after the accident. He noted that trauma aggravates pre-existing arthritis. Dr. Gessner felt that Orgeron's chondromalacia and resultant knee pain and swelling clearly resulted from the automobile accident of June 22, 1987.
In March 1988 Dr. Gessner performed arthroscopy on plaintiff's right knee, inspecting the knee joint and shaving down the bone particles. He testified this surgery was specifically related to the June 1987 accident. Orgeron began physical therapy approximately three weeks post-surgery and was prohibited from working for about six weeks. Dr. Gessner discharged plaintiff from active treatment in December 1988.
Dr. Gessner had examined plaintiff again in April 1992 and again in March 1993, shortly before trial, and stated plaintiff complains *1039 of continued pain. The doctor noted further marked degeneration in the knee, including crepitation and intermittent swelling. Dr. Gessner said the degenerative changes are greater than would be expected in the absence of trauma; although some of the arthritic changes could be attributed to plaintiff's size, most is attributable to the accident.
The doctor opined Orgeron will eventually require surgery for a total knee replacement. Given Orgeron's age at the time of trial (35), the doctor stated he would hope to wait on the knee replacement until plaintiff is around 50 years old, in order to avoid an additional knee replacement later in his life. Prior to that, Dr. Gessner said, plaintiff will likely need to undergo arthroscopic surgery to clean out the knee area once more.
Dr. Gessner stated that Orgeron is overweight, which can aggravate arthritis. He had recommended that plaintiff lose weight and Orgeron had lost about 20 pounds, but had regained the weight. The doctor advised him to avoid stooping, bending, kneeling, crawling, and climbing, and to consider changing to a more sedentary job.
As to expenses of the future surgeries, Dr. Gessner estimated that the present cost of arthroscopy is $10,000, including hospital expenses and surgeon's fee, and said such surgery would require that plaintiff remain off work for five to six weeks. The doctor estimated the present cost of total knee replacement at $60,000, including hospital expenses for five to six days, rehabilitation for seven days, and surgeon's fee, if there are no complications. The defense presented no evidence to oppose Dr. Gessner's estimates.
Finally, Dr. Gessner assigned plaintiff anatomical disabilities for the whole body of 20% and for the leg/knee of 40%. He stated the knee replacement will reduce pain, but also will reduce knee function, and estimated the overall disability following such surgery will be 50%.
The defense presented the testimony of Dr. James Williams, who also testified as an expert orthopedic surgeon. Dr. Williams did not treat Orgeron, but examined him twice (in March 1989 and June 1992) and reviewed his medical records. Dr. Williams stated that plaintiff walked without a limp, which he concluded indicated there was no pain. Dr. Williams noted no swelling and that plaintiff was able to fully extend both knees. He concluded that the patellar chondromalacia was due to degenerative arthritis of both knees, which probably pre-existed the accident, and opined that what he termed the "severe obesity" of the plaintiff contributed to the knee symptoms.
Dr. Williams stated that obesity puts added stress on joints and that losing weight would not help the arthritis but would decrease its symptoms. He assessed plaintiff's disability as 5% anatomical and functional disability of the knee. Dr. Williams stated he saw no need for surgery, either arthroscopy or knee replacement, although he admitted he himself had not conducted any arthroscopic examination of plaintiff, nor had he reviewed Dr. Gessner's surgical report on the arthroscopy. He admitted that Dr. Gessner, having looked inside the knee, had more knowledge of plaintiff's condition.

LAW AND ANALYSIS
On appeal the defense challenges Prescott's liability, the relationship of plaintiff's knee problems to the accident, and Sheriff Lee's right to full recovery of the amounts paid on behalf of plaintiff.

A. Liability
First, as to liability, defendants contend Prescott should not be found liable because plaintiff's actions created a sudden emergency. The operator of a following vehicle is required to keep his car under control, to observe closely a forward vehicle, and to exercise reasonable care under the circumstances. Baach v. Clark, 442 So.2d 514, 517 (La.App. 5th Cir.1983). A following motorist is presumed negligent when he collides with the rear of a preceding vehicle, as it is generally assumed that he has failed in his duty to maintain a sharp lookout or that he was following at an insufficient distance to allow him to stop safely. Welch v. Thomas, 263 So.2d 427, 429 (La.App. 1st Cir.1972), writ denied, 262 La. 1132, 266 So.2d 434 (1972).
*1040 When a following motorist is suddenly confronted with an unanticipated hazard created by a forward vehicle that could not reasonably be avoided, however, the following driver will be adjudged free from fault for the ensuing rear-end accident. Armstrong v. Fireman's Fund Ins. Co., 558 So.2d 646, 648 (La.App. 1st Cir.1990). It is the unanticipated hazard which forms the foundation for the sudden emergency doctrine, such as a dog darting into the road. Fontenot v. Boehm, 512 So.2d 1192, 1194 (La.App. 1st Cir.1987).
However, "[t]he rule of sudden emergency cannot be invoked by one who has brought that emergency on himself by his own wrong or who has not used due care to avoid it. The sudden emergency doctrine is applicable to the standard of conduct of a motorist after an emergency has arisen, it does not apply to lower the standard of care of motorists before the emergency occurs." Dick v. Phillips, 218 So.2d 299, 302 (La. 1969).
The evidence indicates Orgeron was traveling at 20 miles per hour because he was following a car that was driving at that speed. Prescott was aware the cars in front of him were slowing; he had a duty to maintain a sharp lookout and to see what he should have seen. He failed to do so.
Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
We find, from the entirety of the evidence, that reasonable minds could not differ that there was no sudden emergency which would absolve Prescott of fault as a following motorist for striking the vehicle preceding him. That conclusion applies similarly to the apportionment of fault, as reasonable minds could not differ that the defendant was at least fifty percent at fault. We conclude the trial court correctly granted a JNOV as to apportionment of liability.

B. Damages
With regard to damages, once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court. Anderson, supra, at 833. Instead, the trial court should render a de novo award based on its independent assessment of injuries and damages. Id., at 834.
In determining whether the trial court erred in granting the JNOV as to quantum, the appellate court once again uses the same standard. If the answer is in the affirmative, then the trial court erred and the jury's damage award should be reinstated. If the answer is in the negative, then the trial court's damage award based on its independent assessment of the damages is reviewed on appeal under the constraints of Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976). Id.
A medical condition producing disability is presumed to have resulted from an accident if before the accident the injured person was in good health but shortly after the accident the disability-causing condition manifested itself, provided there is a reasonable possibility of a causal connection between the accident and the condition. Sanders v. State Farm Mut. Automobile Ins. Co., 516 So.2d 1162, 1166 (La.App. 2nd Cir.1987); cf. American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, (La.1991).
The test for determining a causal relationship between an accident and subsequent injuries is whether the plaintiff has proved through medical and lay testimony that it was "more probable than not" the injuries were caused by the accident. Mart v. Hill, 505 So.2d 1120, 1128 (La.1987).
*1041 The diagnosis and opinions of a plaintiff's treating physician and specialists to whom referred by the treating physician are entitled to more weight than that of those doctors examining the plaintiff for consultation for litigation purposes only. Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042, 1044 (La.1982).
It is a settled rule of law that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Perniciaro v. Brinch, 384 So.2d 392, 395 (La.1980). When the tortfeasor's conduct aggravates a pre-existing condition, the tortfeasor must compensate the victim for the full extent of the aggravation. Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993).
Applying these precepts to this case, we are forced to conclude the jury erred as a matter of law in failing to award plaintiff damages for aggravation of his pre-existing arthritis and acceleration of the degenerative condition of his knees caused by this automobile accident. There was no evidence that Orgeron's knees caused him any problems prior to the accident, regardless of any degenerative changes that might have been developing.
The jury apparently attributed more weight to the testimony of Dr. Williams, who saw plaintiff only twice, and never treated him, than to that of Dr. Gessner, who had regularly examined and treated plaintiff and who performed surgery on him. However, the jury was clearly wrong to do so. See Rosell, supra.
Reasonable minds could not differ; there was a causal nexus between the accident and plaintiff's injuries and subsequent chronic knee condition. Accordingly, the trial court correctly employed the JNOV to increase the damage awards.
With respect to the amounts of the awards, defendants contend that plaintiff had a duty to mitigate his damages by reducing his weight in accordance with medical advice, as the medical testimony from all the doctors was that excess weight aggravates arthritic changes in the joints. In that respect, our supreme court has stated, "[A]lthough a tortfeasor takes his victim as he finds him at the time of the injury, after that time, the victim has an affirmative responsibility to make every reasonable effort to mitigate damages." Aisole v. Dean, 574 So.2d 1248, 1254 (La. 1991).
Like the supreme court in Aisole, however, while we recognize applicability of the doctrine, our review of the record reveals that the trial judge's award of $35,000 in general damages is not excessive under the circumstances. Aisole, supra; Anderson, supra.
A tortfeasor is required to pay for medical treatment of his victim, even for overtreatment or unnecessary treatment, unless such treatment was incurred by the victim in bad faith. Sumrall v. Sumrall, 612 So.2d 1010, 1014 (La.App. 2nd Cir.1993). Absent a showing that the treatment received by Orgeron here was incurred in bad faith, therefore, the jury erred as a matter of law in denying an award for past medical treatment to plaintiff and reimbursement to Sheriff Lee for medical bills. Accordingly, the trial court appropriately corrected those omissions by means of the JNOV.
With regard to the $70,000 for future medical treatment, future medical expenses are a legitimate item of damages even where the result of such future treatment and its costs cannot be fixed with precision. Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281, 1287 (La.1984); Bly v. Prudential Property and Casualty Ins., 589 So.2d 495, 497 (La.App. 5th Cir.1991). The only testimony regarding the cost of the future surgeries was Dr. Gessner's; accordingly, the trial court correctly adopted his estimated figure.

C. Sheriff's Claim for Reimbursement
Finally, we address the sheriff's intervention for reimbursement. In view of our findings above, there is no merit to defendants' arguments against liability. The jury was clearly wrong and obviously misunderstood the applicable law in refusing to award reimbursement to the intervenor. The JNOV in favor of the sheriff was proper. There is merit, however, in defendants' contention *1042 that the award to the sheriff must be reduced in proportion to the plaintiff's fault.
Defendants rely on La.R.S. 23:1101, a worker's compensation statute, for their argument that an employer who recovers from a third-party tortfeasor any worker's compensation benefits paid to an injured worker shall be reduced by the percentage of comparative fault attributable to the employee. See Chatelain v. Project Square 221, 505 So.2d 177, 184 (La.App. 4th Cir.1987). State law exempts the sheriff from the provisions of the Worker's Compensation Act, however. See La.R.S. 23:1034(B); McKenzie v. Marino, 575 So.2d 506, 507 (La.App. 5th Cir.1991); see also, Parker v. Cappel, 500 So.2d 771 (La.1987).
Instead, under La.R.S. 33:1448, sheriffs and deputy sheriffs must be insured under policies contracted for by the Louisiana Sheriffs' Association, or they may elect insurance under a group policy contracted for by the parish sheriff. Alternatively, sheriffs may form interlocal risk management agencies and establish self-insurance funds pursuant to La.R.S. 33:1481 et seq.
Although La.R.S. 33:1448 gives the sheriff the option of providing worker's compensation benefits to his employees, defendants failed to present any proof that the sheriff has exercised that option. Therefore, the sheriff's recovery is not pursuant to the worker's compensation statutes and La.R.S. 23:1101 is not applicable.
In his brief, Sheriff Lee states he provides health, hospital, surgical and medical expense insurance to his deputies pursuant to La.R.S. 33:1448. In addition, he pays his deputies compensation for time lost from work due to work-related injuries. The sheriff's claim for recovery is predicated on La.R.S. 33:1448(F), which states,
"Sheriffs ... shall be subrogated to all rights and actions which any deputy ... may have for all sums which such sheriffs... have paid or may pay as salary or compensation; as health, medical, surgical, hospital, dental, accident, or death insurance benefits; and as such interest is asserted by suit or intervention for a reasonable attorney's fee therefor. [Emphasis added.]"
Under that paragraph, Sheriff Lee is subrogated to all rights which Deputy Orgeron has against the defendants. However, a subrogee may not exercise greater rights than are possessed by the subrogor. Therefore, the sheriff cannot exercise greater rights than are possessed Deputy Orgeron. See Perkins v. Scaffolding Rental, 568 So.2d 549, 552 (La.1990); Bosch v. Cummings, 520 So.2d 721, 723 (La.1988). Since Orgeron's right to recovery is limited by the comparative fault finding to 50% of the total award, the award to Sheriff Lee must be reduced by that percentage also. The judgment will be amended accordingly.

DECREE
For the foregoing reasons, the judgment of the district court is AMENDED to provide that the award to Harry Lee, Sheriff of Jefferson Parish shall be in the amount of $3,996.40. In all other respects the judgment is AFFIRMED. Costs of this appeal area assessed against the appellants.
AMENDED AND AFFIRMED.