686 So.2d 920 (1996)
John T. DEVLIN, Husband of/and Carmelite D. Devlin
v.
WESTINGHOUSE ELECTRIC CORPORATION, The Glenn Falls Insurance Company, and Stephen P. Zuvich, III.
No. 96-CA-484.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1996.
Writ Denied March 14, 1997.
*922 Julian R. Murray, Jr., Chehardy, Sherman, Ellis, Breslin & Murray, Metairie, Timothy D. Valenti, Metairie, for Appellants.
Christopher J. Aubert, David J. Schexnaydre, Metairie, for Appellees.
Before WICKER, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiffs, John Devlin and his wife, Carmelite Devlin, appeal the amount awarded by the jury in an automobile accident case brought against defendants, Stephen Zuvich, III and Zuvich's employer, Westinghouse Electric Corporation (Westinghouse). We affirm in part, amend in part and affirm as amended and reverse in part.
Plaintiff, John Devlin, was employed as a lieutenant in the Jefferson Parish Sheriff's Office, Narcotic's Department, on December 4, 1992 when a pick-up truck driven by defendant, Stephen Zuvich, collided with the car which plaintiff was driving on his way to the Detective Bureau. Plaintiff was traveling on the river bound lane of the elevated Westbank Expressway and exited at Manhattan Boulevard with the intention of making a U-turn under the elevated expressway. The exit lane was also the turning lane on the street level. It is contiguous to three other lanes for through traffic. There was no traffic in plaintiff's lane as he exited the elevated expressway, but traffic was backed up on the other three lanes awaiting a traffic signal at the corner of Manhattan Boulevard and the street level Westbank Expressway.
Zuvich was leaving the shopping center parking lot at the corner of Manhattan Boulevard and the street level Westbank Expressway when he observed an opening across the three lanes of stopped traffic. He proceeded to cross the three lanes of traffic, pulled into the turning lane in front of plaintiff and collided with plaintiff's vehicle. Plaintiff reacted by jamming on his brakes, locking his arms on the steering wheel to absorb the impact and attempting to turn left, away from the collision. This caused a second impact when plaintiff's vehicle was forced up over the curb. The front side of plaintiff's car struck the left front bumper and wheel of the Zuvich truck. Zuvich admitted that he pulled into plaintiff's lane of travel without seeing him and he was given a ticket. The truck Zuvich was driving was owned by Westinghouse and Zuvich was in the course and scope of his employment at the time of the collision.
Following the accident, plaintiff eventually required a cervical three level disc fusion and became disabled. On March 16, 1993, plaintiffs filed suit against defendants. A jury trial was held on October 17, 18, 19, 1995. Following trial, the jury found Zuvich negligent and awarded plaintiff $73,000 in general damages and $10,000 in medical expenses. The jury did not award any amount for wage losses or loss of consortium.
On appeal, plaintiffs assert that the trial judge erred in permitting defendants, in closing argument, to refer to qualifications of their expert in a field in which the trial judge refused to qualify him. Second, plaintiffs assert that the trial judge erred in denying their motion for Judgment Notwithstanding the Verdict (JNOV) on the issue of quantum, or alternatively, a New Trial.
In addition, defendants raised the peremptory exception of no right of action for the first time on appeal in reference to plaintiff's request for an increase in medical expenses.[1]

NO RIGHT OF ACTION
Under C.C.P. art. 2163, the appellate court may consider the peremptory exception filed for the first time in that court, if it is pled prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record. An action can only be brought by a person having a real and actual interest which he asserts. La. C.C.P. art. 681. The peremptory exception of no right of action is designed to test whether plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit. La. C.C.P. art. 927(5); Louisiana Paddlewheels v. Louisiana *923 Riverboat Gaming Com'n, 94-2015 (La.11/30/94), 646 So.2d 885, 888; Dufour v. Westlawn Cemeteries, Inc., 94-81 (La.App. 5 Cir. 6/28/94), 639 So.2d 843, 848.
Subrogation for the medical expenses paid by the Jefferson Parish Sheriff's Office (Sheriff's office) on behalf of plaintiff in this case takes place by operation of law. However, a subrogation right can be assigned to the insured in writing or it can be made orally. Sutton v. Lambert, 942301 (La.App. 1st Cir. 6/23/95), 657 So.2d 697, 707.
In this case, the Sheriff's Office filed an intervention in the lawsuit to recover the amounts of medical expenses it paid on behalf of plaintiff. It did not participate further. We find that this indicates that plaintiffs pursued the Sheriff Office's remedy with its tacit acceptance. Therefore, we find that the record supports plaintiffs' assertion that plaintiffs were given an assignment and have the right to seek additional medical expenses. The exception of no right of action is therefore denied.

QUANTUM
The evidence showed that at the scene, plaintiff complained of pain in his hip and a mild headache, but did not seek medical attention. Twenty minutes after he left the scene to go to his office to write a report of the accident, he began to suffer tightness in his neck and upper back and he noted these symptoms on the accident report.
The accident occurred on a Friday, but during the weekend the discomfort in plaintiff's neck and shoulders gradually worsened into severe pain and his back muscles began to spasm. His headache also became severe. He began treatment on the following Monday with Dr. V. Hamsa, who treated him conservatively for the pain in his neck and right shoulder. The shoulder injury and hip pain resolved, but the neck pain got progressively worse. He was referred to an orthopedic surgeon after an Magnetic Resonance Imaging (MRI) showed a possible disc problem. He was eventually treated by Dr. Joseph Kott, a neurosurgeon. On March 4, 1993, plaintiff was operated on and three cervical discs were fused.
Plaintiff was employed as police officer with the Sheriff's Office for twenty-three years and was forty-eight years old when the accident occurred. The Sheriff's Office paid plaintiff's medical expenses and continued to pay plaintiff his regular salary from the date of the accident, December 4, 1992, until he was forced to retire on October 24, 1994. He attempted to return to work in December of 1992. On one occasion, he participated in a drug surveillance. At another time he participated in a week long drug trial. After that, plaintiff did not try to work again because he felt that he was a detriment to the other officers since he continued to suffer pain and any medications he took impaired his faculties. When it became obvious that he could no longer perform his duties, the Sheriff's Office required him to retire, which he did on October 24, 1994. He has been unable to work since that time.
Prior to the accident, plaintiff was in excellent health. He had participated in the annual physical tests for the Sheriff's Office two years preceding the accident and performed, without any problems, a number of physical exercises designed to measure strength and dexterity. He never had problems with his back or neck before the accident
Plaintiff testified that the two impacts in the collision jerked his head around, but that he didn't notice the back or neck discomfort until he arrived at his office after accident, noting that his hip hurt most at first. Although he hoped and thought the pain would go away, it got worse on Sunday night when he was on surveillance. Plaintiff testified that before surgery, his shoulder muscles would bulge, his neck was tight and swollen, he had definition in his back muscles in the shoulder blade area and he had numbness and tingling in his hands. He thought that his other side was compensating and it began to hurt. Plaintiff noted that when he worked a sixteen hour shift after the accident, he realized the pain was interfering too much and his condition was creating a hazard for the other narcotics officers on duty with him. Plaintiff stated that Dr. Hamsa referred him to an orthopedic surgeon that he did not like, so he eventually went to Dr. Kott on referral *924 from his internist, Dr. Leonard Kancher. Dr. Kott recommended surgery after several tests indicated three herniated discs, but nevertheless, sent him for a second opinion to Dr. John Schumacher, who agreed. Surgery was performed on March 4, 1993. Plaintiff stated that the surgery helped for a short while, then the pain returned and has become incapacitating.
Plaintiff spent four days in the hospital, one of which was for the myelogram. Afterward, he had a sore throat and neck. He stated that despite the surgery on his three discs, he continues to have severe pain. He tries not to take too much medication because he is afraid of drug addiction, but must when the pain is intense. Plaintiff stated emphatically that he loved his job and would not have retired but for the injury. However, he does not feel that he can perform any work at this time because either the pain or the medications he takes for the pain causes him to have to lay down frequently.
Plaintiff testified that his injury placed a strain on his marriage because he became irritable from the inability to do anything. Plaintiffs engaged in less sex because of his pain. He noted that they previously had an active social life. They liked to go dancing and take trips out of town with friends and family, particularly for local college football games. He said he no longer wrestles with his grandchildren. Plaintiff testified that he and his wife had been caring for his wife's father who was suffering from a lung disease. After he died, they were looking forward to having more free leisure time and money. But now they cannot enjoy themselves as they had before and as they hoped they would in the future.
Plaintiff stated that when he saw the defense psychologist, Dr. Hannie, plaintiff was guarded. He did not think Dr. Hannie was truthful because he said that he did not read Dr. Kott's report and said he did not know defense counsel. In addition, he thought Dr. Hannie was falling asleep during the interview.
Plaintiff, Carmelite Devlin, supports this testimony. She testified that she now has to do both the inside and outside work and that they cannot go anywhere fun. She stated that her husband does not exaggerate, has always been independent and never complained when he was hurt in the past. She said that money (possible financial gain from the lawsuit) was not important enough to him to cause him to exaggerate his pain.
James Devlin, Jr., plaintiff's brother, agreed with the testimony of plaintiffs. He testified that he and his wife used to go out with them all the time. Now plaintiff will not attend family affairs because he needs to lie down. James Devlin, Jr., noted that his brother is depressed and is not the same man.
Dexter Accardo, plaintiff's ex-partner and head of security at the airport, stated that plaintiff has withdrawn socially and is depressed. He stated that plaintiff will not attend department affairs because of pain and the inability to endure the pain without medications. He testified that plaintiff was a good officer, had no prior physical problems and loved his job so much that he turned down a transfer with promotion because he wanted to stay in narcotics. Several months before the accident (March 1992) plaintiff started working for him at the airport doing detail work twice a week. He was planning to go to three times per week. Accardo testified that plaintiff never wanted to retire.
Colonel Anthony Soto, commander of the Narcotics Department and plaintiff's supervisor, testified the same as Accardo. He noted that plaintiff would have likely been promoted again because he was one of the most experienced and knowledgeable narcotic officers in the department. He stated plaintiff had no prior physical problems. However, now plaintiff cannot perform the job he was doing because of physical requirements in apprehending drug users/sellers. He stated that he had no reason to doubt that plaintiff is in pain.
Dr. Joseph Kott, plaintiff's neurosurgeon, first saw him on February 15, 1990 with neck pain on both sides, right upper arm and shoulder pain. He exhibited mild weakness in the right hand, compatible with nerve root compression on the right side. He had right side muscle spasm. He was given three MRI's (January 1993, November 1993 and *925 March 1994), a Myelogram and a CAT scan (computerized axial tomography) on February 8, 1993. An electromyogram (EMG) showed nerve irritability. He was also diagnosed with degenerative changes and some spur formation. The tests indicated that plaintiff had three herniated discs. On the right side, plaintiff had a herniated disc at C-4-5 and he had cord compression at C5-6 in conjunction with a central disc herniation at C-7-T1, on the left. During surgery, Dr. Kott observed the herniations of the central disc at 5-6 and 4-5. He could not see C7-T1, but did see that it was not where it was supposed to be. Dr. Kott fused the vertebra using bone from plaintiff's hip. Dr. Kott testified that the fusion limits neck flexion and puts more pressure on the disc at C-6-7. He said that the added pressure can accelerate degeneration of that disc and cause eventual herniation. He noted that plaintiff was better after surgery for a time, but continued to have muscle spasms and soft tissue problems with stiffness and soreness.
In Dr. Kott's opinion, the injuries were caused by the accident because plaintiff had no prior history of neck pain and his head was thrown around in the accident. He agreed that plaintiff could have had non-symptomatic degenerative discs prior to the accident. He testified that even a mild impact can cause herniation and that herniation does not always produce symptoms immediately. He said that plaintiff noticing pain later is consistent with herniation. Plaintiff also had headaches that were consistent with upper disc herniation. At present, Dr. Kott is treating plaintiff conservatively. However, he stated that now the C-6-7 disc is bulging, but he does not recommend surgery at this time. He felt that plaintiff has reached maximum medical improvement. He testified that plaintiff has good and bad days. Regarding employment, Dr. Kott stated that now the problem is that plaintiff needs pain medication to get through the day and that would pose a risk to himself and others. Dr. Kott believes that the continued pain is being caused by cervical strain syndrome, the new bulging disc and his limited range of motion. He noted that the surgery should have relieved the pressure from the nerves. However, plaintiff's complaints were consistent with his injury and it is not probable that he herniated his discs in any other way than the accident. He testified that surgery does not necessarily make the patient pain free.
Dr. Robert Mendelsohn, the retired, out of state defense neurosurgeon, testified that he never examined plaintiff. He only reviewed the various records and depositions. As a prelude to his testimony, he defined the various terms used in these cases. Dr. Mendelsohn stated that a bulging disc "pooches" out from the vertebrae and is not significant. A herniated disc occurs when the tough cover around the soft material in the disc (anulus) pooches out "grabbing a nerve". A ruptured disc is when the disc cover, the anulus, is torn and the cartilage inside the disc gets into spinal canal. A degenerative disc becomes narrow and spurs form in front of the vertebrae. In addition, there is water loss and "a little pooching out" of the disc.
Dr. Mendelsohn stated that in his opinion, plaintiff sustained only a cervical strain and that he had degenerative disc disease, which is part of the wear and tear on the body as a person ages. He testified that the problem was on the right side so the C7-T1 on the left could not be from accident. He also thought that there was an indication that the C-6-7 disc was bulging before the surgery. He said that plaintiff could not have ruptured three discs in this accident, although he said that a person could have a weak spot allowing a disc to pooch out from one event, but could not have a torn anulus without repetitive force. Despite Dr. Kott's personal observations in surgery, Dr. Mendelsohn claimed that surgery was not needed because there was no correlation between the studies and Dr. Kott's finding. Although he stated that plaintiff can work, he agreed that he cannot work as a narcotics agent because of the fusion. On cross-examination, he noted that the discs were herniated, not ruptured and agreed that even a ruptured disc can occur from minor occurrence if there is weak ligamentous structure and a bulging disc can herniate in an accident from a forceful impact.
Dr. James Laborde, defendant's orthopedic surgeon, examined plaintiff in May 1994, *926 after surgery. He said that plaintiff has a 5-10% impairment of total body, but that he is physically capable of light sedentary work. In his opinion, plaintiff sustained a strained neck or aggravated his pre-existing arthritis in the accident. He felt that the disc injuries were not caused by the accident and that the explanation for plaintiff's pain is psychological, such as depression and financial gain. However, he admitted that in a letter of June 14, 1994, he stated that the records supported the surgery.
Plaintiff was evaluated by Dr. Cornelius Gorman, an expert in vocational rehabilitation, who sent plaintiff for testing to a psychologist, Dr. Stamps, and also met with him on several occasions. Dr. Gorman stated that plaintiff is not employable because he is not released from medical care due to his physical problems. He noted that plaintiff wants desperately to work and is very unhappy that he cannot work. Dr. Gorman testified that plaintiff should continue to see Dr. Stamps regularly to help him cope with his disability and lifestyle change.
Dr. Leighton Stamps, a psychologist, interviewed plaintiff and his wife on December 15, 1994. He tested plaintiff on January 31, 1995 and interviewed him again on August 23, 1995. In his opinion, plaintiff is suffering from chronic depression due to the changes in his life and work, which he previously enjoyed. He went from being active to non-active, which is a tremendous change. Plaintiff lost income, self-satisfaction and self-esteem from the job. Plaintiff must lie down frequently. Dr. Stamps testified that plaintiff watches television most of the time. He suffered a change in the relationship with his wife. In the past plaintiff was easy-going, but he is now short-tempered and easily angered because he feels out of control. Plaintiff continually argues with his wife and his pain interferes with sex. He suffers from nightmares and the pain wakes him. Plaintiff told Dr. Stamps that he tries to not take pain medications because of the side effects. Dr. Stamps stated that pain, inactivity and change in the marital relationship caused the depression.
Dr. Stamps testified that plaintiff was given tests[2] that shows information about the emotional factors and which includes a section to test for exaggeration for monetary gain. The results indicated depression and anxiety and there was no indication of exaggeration or faking for monetary gain. To the contrary, the tests showed that plaintiff tends to minimize. His goal is to return to being a police officer or, if not, to do some other work. He stated that depression is consistent with pain and inactivity and treatment would improve his depression and his relationships. However, he noted plaintiff has not continued to see him because these type of people think they can handle their problems and he is not ready to admit he needs help. Dr. Stamps said that plaintiff told him that when he saw Dr. Hannie, Dr. Hannie fell asleep and plaintiff caught him in several lies. Dr. Stamps stated that plaintiff had no rapport with Dr. Hannie and that he had heard the same thing from other patients.
Dr. Thomas Hannie, the defense psychologist, testified that he interviewed and tested plaintiff.[3] He found plaintiff to be depressed as result of the injury, surgery and pain, which is heightened by depression (circular effect). However, he contended that plaintiff would feel better if he increased his activity. He felt that plaintiff was not fully cooperative and thought he was posturing for financial gain. In regard to plaintiff's complaints about him, Dr. Hannie said that he likes to close his eyes to listen. He stated that he did not lie to plaintiff because when plaintiff asked if he knew trial counsel for the defense, he did not know him at the time he saw plaintiff.
Jeffery Carlisle, the defense vocational rehabilitation expert, stated that he saw plaintiff on April 25,1995 and concluded that plaintiff has transferable skills: knowledge of law enforcement, supervisory experience and excellent communication skills. Carlisle stated *927 that plaintiff could be a security supervisor, work in surveillance, hotel security, or be a security site supervisor. He said that there are some opportunities for part-time work in those businesses. Carlisle stated that he had contacted various companies with openings. Although all of the physicians testified that plaintiff could not do police work or work involving physical risk, he included police lieutenant and school security because he felt that plaintiff could do some aspects of those jobs under the Americans with Disabilities Act.
Finally, Dr. Melville Wolfson, plaintiff's economist, testified to plaintiff's lost wages. He calculated past lost wages to be $64,904. He testified that plaintiff lost his salary of $30,483 for one year (from date of resignation, October 24, 1994, until date of trial, October 17, 1995). He included car mileage because plaintiff had a vehicle available for his personal use when he worked for the Sheriff's Office. In this respect, Dr. Wolfson stated that plaintiff told him that he drove the car approximately 100 miles per week for personal matters. Dr. Wolfsen calculated the mileage at 29 cents per mile and added this figure to the salary loss. He calculated plaintiff's lost income from the detail work from date of the accident until date of trial, at a rate of $15 per hour times 12 hours per week, totaling $34,421.
In calculating future lost wages, Dr. Wolfson used a base annual salary of $43,080, derived from his base salary with a 7% percentage increase over fourteen years of work life expectancy (based on an adjusted average six year wage history). Plaintiff was 51 years old at time of trial and Dr. Wolfson used a retirement age of 65. He also included car mileage in the amount of $20,000, discounted the figure and concluded that plaintiff lost wages in the amount of $590,546, assuming plaintiff cannot work at all. He stated that if plaintiff is assumed to be able to earn income at half his salary, then the figures should be adjusted accordingly.
Plaintiffs first contend that the trial judge erred in refusing to sustain their objection to defense counsel's reference in closing argument to Dr. Mendelsohn's self-taught expertise in the area of "injury mechanism", even though the reference arose in the context of defense counsel's reading Dr. Mendelsohn's questioning on his qualifications. Plaintiffs assert it was error because the trial judge had refused to accept him as an expert in that area during questioning on his qualifications, it had no evidentiary value and it should not have been considered by the jury once the trial judge ruled that the witness was not qualified to in that area. Plaintiffs argue that the trial judge's refusal to sustain their objection to the reference in closing may have given the jury the impression that they should consider Dr. Mendelsohn's expertise in "injury mechanism."
"The propriety of argument in a civil jury trial must be determined in the factual light of the particular matter, the conduct and atmosphere of that particular trial and the arguments of opposing counsel." Bourque v. Gulf Marine Transp., Inc., 480 So.2d 337, 342 (La.App. 3 Cir.1985); Luquette v. Bouillion, 184 So.2d 766 (La.App. 3rd Cir.1966). The parties are granted great latitude in argument before a civil jury, but the trial judge has the duty to confine the arguments within proper bounds. Bourque v. Gulf Marine Transp., Inc., 480 So.2d at 342. The trial court's rulings regarding alleged improper argument are presumed to have been made within the trial court's discretion, unless the contrary is shown.
Dr. Mendelsohn's qualifications were recited to the jury in closing argument over plaintiffs' objection. During questioning on his expertise, the trial judge refused to qualify Dr. Mendelsohn as an expert in the unrecognized area of "injury mechanism", in which the doctor claims expertise based on his experience. Whenever the witness attempted to veer into this area in his testimony, plaintiffs' objection was sustained. Yet defense counsel read the prior questioning to the jury in closing, especially emphasizing Dr. Mendelsohn's experience in the area and impressing the jury that the doctor published articles and books on automobile crashes and their relation to neck injuries. This was clearly a veiled attempt to do indirectly what the defense could not do directly, that is, to make the jury believe that Dr. Mendelsohn's testimony should be given greater weight as to *928 causation than any of the other witnesses because of his expertise in "injury mechanism". Thus, we find that the trial judge erred in refusing to sustain the objection and that there is a strong probability that the jury was influenced by the improper argument. Consequently, we will review the damage award de novo.
Plaintiff has the burden of proving by a preponderance of the evidence that the injury was caused by the accident. Tartar v. Hymes, 94-758 (La.App. 5th Cir. 5/30/95), 656 So.2d 756, 758, writ denied 95-1640 (La.10/6/95), 661 So.2d 475. There is a legal presumption of causation when the evidence shows that the plaintiff was in good health prior to the accident, but after the accident, the symptoms of the disabling condition appear and continuously manifest themselves. Dabog v. Deris, 625 So.2d 492, 493-494 (La. 1993); Tartar v. Hymes, 656 So.2d at 758; Orgeron v. Prescott, 93-926 (La.App. 5th Cir. 4/14/94), 636 So.2d 1033, 1040. However, the medical evidence must show there is a reasonable possibility of causal connection between the accident and the disabling condition. Dabog v. Deris, 625 So.2d at 493-494 (La.1993). Tartar v. Hymes, 656 So.2d at 758; Orgeron v. Prescott, 636 So.2d at 1040.
In addition, a treating physician's diagnosis and opinions are accorded greater weight than those of the doctors examining the plaintiff for consultation for litigation purposes only. Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042,1044 (La. 1982); Orgeron v. Prescott, 636 So.2d at 1040. The reason for such preference is that the treating physician is more likely to know the patient's symptoms and complaints due to repeated examinations and sustained observations of the injured person. Bates v. Willis, 613 So.2d 691, 694 (La.App. 5th Cir. 1993); Schilling v. Bigelow Liptak Corp., 427 So.2d 452, 455 (La.App. 1st Cir.1982). This is especially true when the doctor consulted for litigation did not examine the patient, but based the opinion solely on medical records. Orgeron v. Prescott, 636 So.2d at 1040; Martin v. Rollins Services, Inc., 424 So.2d 429, 432-433 (La.App. 4th Cir.1982).
It is a settled rule of law that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Orgeron v. Prescott, 636 So.2d at 1040; Perniciaro v. Brinch, 384 So.2d 392, 395 (La. 1980). When the tortfeasor's conduct aggravates a pre-existing condition, the tortfeasor must compensate the victim for the full extent of the aggravation. Orgeron v. Prescott, 636 So.2d at 1040; Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993). In addition, a tortfeasor is required to pay for medical treatment of his victim, even if it is determined that the medical treatment was unnecessary, unless the evidence shows that the excessive treatment was incurred by the victim in bad faith. Orgeron v. Prescott, 636 So.2d at 1041; Sumrall v. Sumrall, 612 So.2d 1010, 1014 (La.App. 2nd Cir.1993).
The evidence in this case shows by a preponderance that plaintiff was injured in the accident and that the three cervical disc herniations resulting in fusions were caused by the accident. There was no evidence that Devlin's neck caused him any problems prior to the accident, regardless of any degenerative changes that might have been developing. The evidence was to the contrary. In addition, the evidence was overwhelming that plaintiff is still suffering from pain, probably from the disc in his neck that now has to carry all of the weight. We conclude that plaintiff is entitled to an award for general damages in the amount of $150,000.
In addition, whether the three cervical disc fusions resulted from trauma to a pre-existing non-symptomatic degenerative condition or whether the neck injury was solely a result of the accident, plaintiff is entitled to recover all of his medical expenses and his lost wages. The evidence was uncontradicted that his medical expenses totaled $48,862.15. We will increase the medical expenses to that amount.
Likewise, the evidence was uncontradicted that plaintiffs suffered a change in their relationship on a intimate level, a social level and in their day to day interaction and daily division of chores. Therefore we find *929 that Mrs. Devlin is entitled to an award for loss of consortium in the amount of $20,000.
Finally, the evidence on lost wages was clear that Devlin can no longer work as a police officer. However, he may be able to perform some type of work in the future. We conclude that plaintiff should receive past lost wages in the amount of $64,904 and future lost wages in the amount of $276,376.02.[4]
Accordingly, the judgment of the trial court is hereby affirmed as to liability. The judgment is amended to award John Devlin $150,000 in general damages, $48,862.15 in medical expenses, $64,904 in past lost wages and $276,376.02 in future lost wages. We further reverse the judgment and award Carmelite Devlin $20,000 for loss of consortium. The awards are made together with legal interest from date of judicial demand, until paid.
Trial and appellate costs are to be paid by defendants.
AFFIRMED IN PART, AMENDED IN PART AND AFFIRMED AS AMENDED, REVERSED IN PART.
NOTES
[1] Defendants also filed a motion to strike language in plaintiffs' brief, which we deny.
[2] He was given the Symptom Checklist90 and the Millon Clinical Miltiaxial Inventory.
[3] He used the Adult Life History Questionnaire, the Minnesota Multiphasic Personality test, the Multidimensional Pain Inventory and the Hendler pain test.
[4] Average wage over six years per income tax returns is $28,966.83 × 14 years = $405,535.62 divided by 2 because he probably is able to earn one-half of his past income = $202,767.81, plus $20,000 for use of car = $222,767.81 + 4% increase of $8,910.71 = $231,678.52. Add detail income of $65,500. Total 14 year detail estimate is divided by 2 since he may not choose to work them. $131,000 divided by 2 = $65,500. $231,678.52 + $65,500 = $297,178.52 discounted by 7% ($20,802.50) = $276,376.02.

The wages reported on the income tax returns were: 1988-$26,700; 1989-$24,800; 1990-$27,500; 1991-$30,046; 1992-$36,600; 1993-$28,155.