694 So.2d 362 (1996)
Fairie Catherine ROIG and George T. Roig
v.
TRAVELERS INSURANCE COMPANY, et al.
No. 96-CA-164.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1996.
Opinion Granting Rehearing February 18, 1997.
Writ Denied May 1, 1997.
*364 J. Robert Ates, Joel T. Chaisson, Destrehan, Elizabeth Rue Bridgeman, New Orleans, for Plaintiffs/Appellants Fairie and George Roig.
Arthur J. Lentini, Stephen T. Wimberly, Metairie, Edmund Golden, Assistant Parish Attorney, Parish of Jefferson, Gretna, for Defendants/Appellees.
Before GAUDIN, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiffs, Fairie and her husband, George Roig, appeal from the amount of damages awarded in an automobile accident case against defendants, the Parish of Jefferson (the Parish), employer of the tortfeasor driver, Eugene Hopson (Hopson), Travelers Insurance Company, insurer of the Parish and Hopson, and Aetna Casualty and Surety Company, plaintiffs' uninsured/underinsured motorist carrier. We affirm in part, reverse in part, amend in part and affirm as amended.
On March 21,1986, Mrs. Roig was on her way to the Jefferson Parish Vocational Technical School where she was studying to become a licensed practical nurse (LPN). She stopped her car on Airline Highway in order to make a left turn onto Blair Street, where the school is located. While she was stopped, her vehicle was hit from the rear by a 20,000 to 22,000 pound cement truck going 15 to 20 miles per hour. The truck was owned by the Parish and driven by Hopson. A classmate of Mrs. Roig, Carol Hennis (Hennis), was stopped behind the concrete truck and witnessed the accident.
Following the collision, Hennis went to Mrs. Roig's aid. She found that Mrs. Roig's hands were cold, she was crying and shaken and she stated that her back and neck hurt. Hennis escorted her to the nearby school to use the telephone. While there, Mrs. Roig was told to lie down in the hospital area because she was not feeling well. When Mrs. Roig and Hennis returned to the accident scene, Mrs. Roig was wrapped in a blanket. She was eventually taken to the Ochsner Foundation Hospital (Ochsner) emergency room and treated for neck, back, right arm and right shoulder pain. She was given medication and told to return if the pain continued. She returned to the emergency *365 room that evening because of increased pain. X-rays were taken which were negative. Mrs. Roig was told to see an orthopedic surgeon if the pain persisted. Ten days later, she went to an orthopedic surgeon, Dr. Frank Schiavi, the first of numerous physicians who saw and treated her since the accident.
Charles Zweiffel, the Parish's road maintenance supervisor, and Dale Dufrene, the supervisor in charge of the concrete division of the streets department, spoke to Mrs. Roig at the accident scene. They heard Mrs. Roig complain of neck and back pain. In contrast, Hopson stated that following the accident Mrs. Roig told him that she was not hurt.
Plaintiffs filed suit against defendants on March 18, 1987. A bench trial was held on February 24-27,1992, February 1-3 and 5, 1993 and March 10-12, 1993. The trial judge ordered post-trial briefs and rendered judgment more than two and one half years after the conclusion of trial, and close to four years after the trial began, on November 14, 1995 in favor of Mrs. Roig in the amount of $45,093.16.[1] The trial judge denied Mr. Roig's claim for loss of consortium.[2]
Plaintiffs assert that the trial judge erred in awarding inadequate damages to Mrs. Roig and in failing to award damages for loss of consortium to Mr. Roig. In particular, plaintiffs contend that the trial judge erred in failing to give proper weight to the testimony of the treating physicians, the vascular surgeon and the three defense medical experts who agreed with plaintiffs' experts regarding Mrs. Roig's continued pain, causation of the pain, that she is not a malingerer and that she is not asserting the claim for secondary gain. Plaintiffs further assert that the trial judge erred in failing to abide by his order "freezing" the medical evidence to the February 1992 trial date by permitting defense witness, Dr. Robert Newman, to testify to a changed opinion based on post-1992 information.[3]
Plaintiffs argue that the amount of damages awarded to Mrs. Roig are inadequate because she suffered a cervical strain, right hip bursitis, right knee bursitis, right shoulder bursitis, reflex sympathetic dystrophy, intermittent thoracic outlet syndrome, fibromyositis, multiple recurrent deep vein thromboses, aggravation of preexisting knee arthritis, major depression and post-traumatic stress disorder. Plaintiffs assert that Mrs. Roig's medical bills totaled $131,563.30 through date of trial for treatment of her injuries. They note that she was diagnosed and treated by twenty-seven physicians and consultants in three hospitals and that the evidence presented by eleven treating doctors and both plaintiffs' and defendants' vocational rehabilitation experts, show that she is totally and permanently disabled.

FACTS
The evidence reveals that Mrs. Roig had polio in her left leg when she was two years old. Although that leg is smaller and the muscles more wasted than the right leg, she did not have an obvious limp or disability from the polio. In fact, Hennis and Phyllis Turner (Turner), the Nursing School Director, both testified that they were not aware that she had been a polio victim. The medical evidence presented in reports by Drs. Robert Campos and Carlos Villabona of the Texas Institute of Rehabilitation and Research, as well as the testimony of treating physicians Drs. Maria Palmer, Leon Weisberg, Alonzo Diodene and Richard Morse, clearly ruled out post-polio syndrome as a cause for her continued pain following the accident of March 21, 1986.
Before the accident, Mrs. Roig was a relatively healthy individual, with an active home and social life. She worked steadily from a young age in either the medical community or the medical insurance industry. In her youth, she was academically successful in school and was active in many sports. At the time of the accident, she was thirty-six years old. Plaintiffs have three children and *366 two grandchildren from previous marriages. Both testified that they had a normal lifestyle, with a healthy sexual relationship before the accident. They socialized regularly, danced and participated in church activities within their own church, as well as assisting in school fairs, raffles and dances for the St. Rita's Dad Club. Mrs. Roig played basketball, volleyball, cabbage ball and coached a little league girls team. This was confirmed by the testimony of their church pastor, Alan Eldridge, who was also Mrs. Roig's employer, Malcolm Graff, her softball coach and a St. Rita's Dad Club member, Hennis and Turner. All of the lay witnesses testified that she was a hard worker and an enthusiastic participant in her social, church and school activities.
Mrs. Roig held a paying job as secretary at her church. She also helped organize the yearly Vacation Bible School, which involved finding temporary housing for the out-of-town children, arranging transportation, taking them sightseeing and generally overseeing their needs. She sang at weddings and other functions, assisted in the church nursery and helped organize department dinners and Woman's Day at the church.
Mrs. Roig testified that after the accident, she was unable to continue with any of her prior church or social activities because she was in constant pain. Her job at the church continued for several months, but her husband and children were forced to perform more and more of her duties. Pastor Eldridge stated that he was regretfully forced to terminate her employment in October of 1986.
In addition, Mrs. Roig was pursuing an LPN degree. She hoped to use the LPN degree as a stepping stone to a registered nurse (RN) degree. Mrs. Roig testified that, after the accident, she continued going to class despite her pain because she would have been dismissed from the school program if she were absent for three days. She used a wheeled "drag-along" to help her carry her books. However, she stated that her physical limitations after the accident eventually precluded her from completing the nursing course.
Turner testified that Mrs. Roig was class vice-president, had scored in the 90 percentile on her entrance exam and her grade average at school was 94.5%, a very high average. When the accident occurred, the students were starting the clinical part of the nursing program. Turner was confident that Mrs. Roig would have completed the course and that she would have been comfortable in the clinical setting, despite its physical requirements. Turner also stated that her students had a 100% job placement success. Furthermore, she confirmed that 50% of the school's students continue their studies to become RNs.
In addition to the polio Mrs. Roig had as a child, her medical history prior to the accident showed that she had hypoglycemia, gallbladder surgery, a hysterectomy, ulcers, breast lumps and asthma. Shortly before the wreck, she went to the hospital emergency room for flu-like symptoms. After the accident, during the years prior to trial, she suffered from ovarian cysts, bladder infections, ear/throat infections, poraisis, throat blisters, chest pain, inflammatory bowel disease symptoms, vomiting, chest pain and blood clots. She related many of the post-accident symptoms to the numerous pain and muscle relaxant medications she was taking. None of her prior illnesses involved the right side of the body or the neck, back, arm or knee. Prior to the accident, she had never suffered blood clots in her leg.

PHYSICAL INJURIES
Immediately after the accident, plaintiffs testified that Mrs. Roig suffered headaches and pain in her neck, right shoulder, right arm and right hand. At the scene, Mr. Roig testified that she was shivering, crying and complaining of pain. Mr. Roig did not accompany her to the emergency room, but stayed at the scene. He testified that he worked in sales with Metropolitan Insurance Company. Ten days later, after being treated twice at Ochsner, she went to Dr. Frank Schiavi, Jr., an orthopedic surgeon. Over the course of the next several years, she was seen by Dr. Ray Haddad, orthopedic surgeon, Dr. Alonzo Diodene, orthopedic surgeon, Dr. Maria Palmer, neurologist, Dr. Leon Weisberg, neurologist, Dr. Michael *367 Gold, anesthesiologist, Dr. Rose Eckert, psychiatrist, Dr. Deborah Martinez, psychiatrist, Dr. Peter Moulder, vascular surgeon and Dr. Richard Morse and his team at the Touro Center for Chronic Pain (Touro). In addition, various other doctors at the Tulane University Medical Center's (Tulane) departments of neurology and psychiatry examined and/or reviewed Mrs. Roig's medical progress.
Plaintiffs testified that Mrs. Roig continued to suffer severe pain in her neck, back, right shoulder and right arm. She stated that her right arm was occasionally discolored and numb and she had spasms in her right arm which prohibited her from writing. She contended that there was no intervening trauma. As a result of her pain, she gained weight and began to use a leg brace to help her right leg from further deterioration. She claimed that the pain prevented her from driving her car. She takes a bus for the disabled or her husband drives her to her appointments. She discontinued her home, work and social activities. Both plaintiffs testified that their marriage intimacy changed drastically because of the pain. She stated that she could not concentrate and began to forget messages. In addition, she testified that she became almost bedridden, was sleeping poorly, having nightmares, becoming more emotional and was depressed.
Because of the depression, Mrs. Roig began treatment with Dr. Eckert and various psychiatric residents in the psychiatry department at Tulane. Eventually she was referred to Touro, where she spent thirty days learning to cope with the pain with biofeedback and was taught exercises to help ease the pain. She testified that she presently tries to paint a little and she walks in the malls for exercise pursuant to a doctor's recommendation.
Mrs. Roig has been treated by various doctors by referrals, primarily at Tulane. She is still under treatment with Drs. Weisberg, Eckert, Morse and Diodine. She claims that her pain has not abated, that she gets headaches two to three times per week, that her arm pain is constant, varying only in intensity. She contends that her right hand and right shoulder hurt most of the time. She noticed discoloration in her arm/hand and swelling two to three times per week which waxes and wanes and is affected by weather and activity. She also testified that her right knee has become problematic and that she has avascular necrosis in the knee. She could not remember if she hit it in the accident, but she did not have any problem with it before. She also developed blood clots in her right leg, which she contends was a result of the force placed on her right leg, which was on the brake at the time of impact.

Dr. Frank Schiavi (1986-1987 and 1991Present)
Dr. Frank Schiavi, Jr. first saw Mrs. Roig on March 31, 1986 for complaints of headaches, neck and upper back pain and numbness and weakness of the right arm/hand. She had spasms in her neck and her right arm and shoulder exhibited "stocking glove hypesthesia" or diminished sensation over the right arm. In addition, the right arm was showing a flushed color in contrast to the other arm. His initial diagnosis was cervical strain, but he wanted nerve conduction studies of the arm. He removed her cervical collar and prescribed an anti-inflammatory medication. In April, she was given an electromyogram (EMG), which was normal and she started physical therapy. In July she underwent computerized axial tomography (a CAT scan), performed by Dr. Vogel which was negative.
Dr. Schiavi continued to treat Mrs. Roig as she was experiencing neck spasms and tenderness over the right shoulder. Her neck and arm were still painful. The doctor prescribed isometric exercises and a special pillow. On her fifth visit August 28, 1986, she first mentioned pain in her right knee and right hip, which he stated was bursitis. She told the doctor that the pain started two to three weeks prior to the visit. She continued to complain of right shoulder pain, which was tender on examination. In spite of the delay in reporting the knee and hip pain, Dr. Schiavi stated that the pain and anti-inflammatory medications could have masked the pain, particularly since she was sedentary after the accident. He noted that she had her foot on the brake when the impact occurred. He stated that the force from the *368 impact on the brake leg would be consistent with the type of knee and hip complaints made by Mrs. Roig. On cross-examination, Dr. Schiavi stated that it would be unusual for the medications to mask the injury for five months. However, he concluded that it was more probable than not that the accident caused the knee and hip condition, as well as the neck, shoulder, arm and hand problems.
Dr. Schiavi treated Mrs. Roig with injections in her shoulder, knee and hip from July through September, 1986. At that time, he referred her to Dr. Haddad because she was having difficulty getting to his office. Dr. Haddad treated her until his death. On March 20, 1991, she returned to Dr. Schiavi. In the meantime, her knee was operated on by Dr. Diodene, who wanted to put a brace on it. Since she did not understand why it was necessary, she returned to Dr. Schiavi. He explained that a brace on the left leg was necessary because of the stress on the right leg, which was unstable after surgery. She then agreed to wear the brace. Dr. Schiavi next saw Mrs. Roig on June 7, 1991. She continued to have knee and hip pain. At that time, they discussed physical therapy and magnetic resonance imaging (MRI).
On cross-examination, Dr. Schiavi stated that it was not unusual to find "stocking glove hypesthesia" on an entire limb. He emphasized that the first knee complaint was to the bursa (on the outside of the knee), which would not have prevented her walking after the accident. He noted that the surgery performed on her by Dr. Diodene was for an intra-articular problem (inside the knee).

Dr. Maria Palmer (1986-1987)
Dr. Palmer, a neurologist, saw Mrs. Roig in May of 1986 on referral from Dr. Schiavi. She reported headaches, forgetfulness, difficulty concentrating, difficulty sleeping, pain primarily on the right side of the neck, pain traveling from the right armpit to the right hand and from the shoulder to the wrist, numbness in the last three digits of the right hand, distended veins in the right hand and discoloration of the right hand. She complained about low back and right leg pain. On examination, Dr. Palmer found very marked neck spasm on the right side, limited lateral flexion and a mildly swollen right hand. Based on her history and the examination, her first impression was that she suffered a mild concussion and cervical strain and had functional thoracic outlet syndrome. She prescribed anti-inflammatory medication, a muscle relaxant and daily physical therapy. She scheduled an electroencephalogram (EEG), which was negative.
On the second visit, on May 20, 1986, the doctor noted that Mrs. Roig's right hand was discolored. In June, the doctor recommended conservative treatment of physical therapy, cervical collar and Motrin. In September, Mrs. Roig reported that the collar was not helping, but the therapy helped the pain to some degree. She reported the same pain and numbness, along with aching and tingling in all the right fingers precipitated by movement. She was still having headaches. On examination, the doctor found right neck spasms and limited lateral flexion to the left with tenderness. An EMG was taken, but was normal.
In October, Mrs. Roig complained that she was depressed and had gained weight from her forced sedentary lifestyle. Dr. Palmer prescribed an anti-depressant and a sedative to help her sleep. No spasms were found. In the November visit, the doctor stated that her mood was better, but she now had psoriasis. Dr. Palmer stated that this can be caused by stress. On examination, the neck spasm had returned and there was spasm in the lumbar zone. In addition, she had peripheral edema (swelling), which could have been caused by the anti-inflammatory medication. Her depression was worse in December. In addition, she placed telephone calls to the doctor reporting her pain and distress. She reported that she was remaining in bed, except for doctor visits.
The doctor saw plaintiff again in January of 1987. Her complaints were the same and she exhibited discoloration and coolness of the right hand. Mrs. Roig was now having nightmares, caused by the medication or by anxiety. Dr. Palmer recommended that she see a psychiatrist. The doctor thought that she was suffering from post-traumatic stress disorder. She took her off of all of her medications and ordered an MRI. The doctor *369 next saw her in February of 1987. The results of the MRI showed degenerative changes at C-7 with a possible bulge at the same disc level. Dr. Palmer testified that a bulge can be aggravated by trauma and because of her activity level prior to the accident, she believed that it was probable that the accident aggravated any pre-existing degenerative problems or the pre-existing bulge.
In later February, a myelogram and CAT scan was performed at Doctor's Hospital. Mrs. Roig remained in the hospital from February 17 through February 20, 1987. The tests disclosed small central bulging discs at C-4 through C-7, which Dr. Palmer concluded were aggravated by the accident. At this time, Dr. Palmer's diagnosis was cervical sprain and spondylolysis, aggravated by cervical strain. Nerve root entrapment was ruled out. She was discharged with pain medication and anti-medication. However, Mrs. Roig's complaints continued and in her last visit in May of 1987, Dr. Palmer suggested that she get a parasympathetic block. Dr. Palmer's final diagnosis was cervical strain, intermittent muscle spasm in the shoulder area causing intermittent thoracic outlet syndrome (TOS), as evidenced by numbness, fibromyositis or myofascial pain (pain from the fibrous tissue and muscles) and that she was possibly developing causalgia or reflex sympathetic dystrophy (RSD) caused by dysfunction of the sympathetic nerve (as evidenced by the pain, discoloration of the hand and swelling). Dr. Palmer testified that the latter dysfunctions are difficult to diagnose and manage and that the longer the problems exist, the harder they are to treat. Dr. Palmer explained that RSD diagnosis is based on persistent pain with general aching, sometimes gnawing and throbbing pain and/or a burning sensation and hypersensitivity. Other symptoms are swelling, discoloration and temperature changes in the hand, fingernail changes, hair loss, atrophy and osteoporosis. She stated that patients given sympathetic nerve blocks do not always get relief and that testing mechanism does not disprove the fact that a patient may have it. Patients with RSD do not have to exhibit all of the symptoms to have the dysfunction. Dr. Palmer also stated that both the fibromyositis and the intermittent TOS are treatable with exercise. She testified that the Doppler Test was not an appropriate method for diagnosing TOS and she would not defer to a vascular surgeon on this issue because it is part of a neurological diagnosis. Dr. Palmer concluded that all of Mrs. Roig's complaints, including the depression, were caused by the accident.

Dr. Haddad (1987)
Dr. Ray Haddad, an orthopedic surgeon, saw Mrs. Roig in May of 1987 on referral from Dr. Schiavi.[4] She presented the same complaints and the exam showed that the right side of her neck was tender, there was no significant spasm, she had fair to good range of motion, but with a decease in motion to the right side. Her right shoulder was tender and showed some impingement, probably to the rotator cup. She had a good range of motion, but was weak on abducting the shoulder secondary to pain in the right upper extremity. Dr. Haddad reported a decrease in grip and that she might have a positive Addison's test because she lost some pulse in the right arm. He found her x-rays normal. After later visits, he found TOS to be a possibility. He also concluded that she might be getting RSD. He related the accident to her neck, upper back, shoulder and right arm. He also stated that another MRI was warranted at the cost of $700. Dr. Haddad stated that she would require further office visits. Possible shoulder surgery for the impingement would a cost of $3,000 to $4,000. He did not recommend cervical fusion. He concluded that Mrs. Roig was 100% disabled from work.

Dr. Leon Weisberg (1987Present)
On June 1, 1987, Mrs. Roig was seen by Dr. Weisberg, the head of Tulane, Department of Neurology, at the request of Dr. Dan Rush, a vascular surgeon. After his examination, he diagnosed cervical strain, injury to nerves in the upper extremity, defined as RSD and also TOS, involving the C-8 and T-1 root regions. He noted discoloration in her arm and noted Dr. Palmer's findings of finger numbness, hand discoloration and hand *370 swelling. He testified that those are classic RSD signs, although there are other symptoms. Dr. Weisberg stated that there is a narrow window of opportunity to treat RSD successfully, so he ordered a confirmatory nerve block test. This was performed by anesthesiologist, Dr. Gold. The test was positive, with a marked decrease in pain. More nerve blocks were done to relieve the pain because the effects are temporary and last for shorter periods. The patient can become a candidate for surgery to cut the sympathetic nerves to block the pain response. However, the longer the time goes on, the less effective the treatment methods become. Dr. Weisberg did not know why a sympathectomy was not done, but it was too late when he saw her. He testified that the condition was permanent. He also stated that RSD is trauma-induced and that the accident caused the condition. Dr. Weisberg testified that pain from RSD is significant and can be all-consuming. Thus, Mrs. Roig would be incapable of most forms of work, particularly because she was also suffering from depression. In addition to his own examination, Dr. Weisberg reviewed the records from Touro where she was a patient. He agreed with the findings. In regard to the TOS, Dr. Weisberg noted that nerves are an electrical system and thus TOS can be intermittent.
Dr. Weisberg testified that the most accepted diagnostic test for RSD is the stellate ganglion nerve block test. Dr. Weisberg stated that even if Mrs. Roig responded to a placebo block, in her case it was given after she had already received nine blocks and the best time for the placebo block was in the beginning of the treatments. Dr. Weisberg testified that the prior blocks can set up a cycle in the nervous system to condition it to respond to the placebo. Dr. Weisberg testified that one third of patients will respond to placebo and 5% will get sick from an oral placebo. He believed that the placebo response was meaningless to the diagnosis of RSD.
Dr. Weisberg stated that RSD has two stages. In the dependent stage, it is treatable, but when it goes into the independent stage the efficacy of the block is questionable because it gets out of the sympathetic nervous system and into the central nervous system. He stated that was why the longer a patient has the problem, the more difficult, if not impossible, the condition becomes to treat. On cross-examination, Dr. Weisberg was referred to a contrary opinion by Dr. Richardson, Director of Touro and Chairman of Neurosurgery at Tulane. Dr. Weisberg was not persuaded otherwise by this because he thought it was a "curbside" opinion. Dr. Weisberg noted that Dr. Richardson had not seen the patient, but only responded to a casual consult by Dr. Gold. Dr. Weisberg testified that Mrs. Roig was reported to have had waxing and waning coldness in the hand, which he said is common. However, while he relied on the other physical symptoms reported by her and other doctors, he did not personally observe any physical signs of the condition. Dr. Weisberg also testified that because of the blood flow, a bone scan report reaffirmed his opinion. In addition, Dr. Weisberg testified that he looks at the whole picture to make a diagnosis of RSD. He noted that other doctors besides Drs. Palmer and Shiavi observed discoloration and sensation problems. He concluded that she suffers from RSD and TOS as a result of the accident.

Dr. Michael Gold (1987)
In June of 1987, Dr. Gold, an anesthesiologist, was involved with pain management at Tulane when Mrs. Roig was referred to him to evaluate the possibility of RSD. His examination showed tenderness on the right neck and shoulder, mild weakness on both sides and response slightly diminished on the right upper extremity. Dr. Gold performed stellate ganglion blocks which can be used for diagnostic and therapeutic purposes. The stellate ganglion block is performed by first isolating the sympathetic nerves to the head and upper extremity and then depositing local anesthetic near the nerves to temporarily interrupt the involved nervous system to try to interrupt the pain. The main physical finding showing that a block has been achieved is "Horner's Syndrome" or increased temperature to the upper extremity involved. The expectation is a decrease in pain and a response to the pain typically shows after thirty minutes. Dr. Gold performed *371 nine blocks. Mrs. Roig obtained relief for two to three weeks each time. The tenth "placebo" block inserted saline, rather than an anesthetic. She reported the same relief. Dr. Gold stated that the result could be explained because it was a "trained response", that it was an anticipatory response or psychogenic response, or that the patient believed it would be better so the pain was relieved. Dr. Gold testified that he was trying to determine if she was a candidate for surgery, but he concluded that she was not. Dr. Gold stated that he informed plaintiffs that Mrs. Roig's psychiatrist would be better able to help her because he felt that the response to the placebo was psychological. He did not think RSD was a prominent feature of her ongoing problems, but he agreed that the changes noted by Drs. Palmer and Schaivi were symptoms of RSD and that RSD symptoms can wax and wane. In addition, the physical changes would not be expected if the condition had not reached the dystrophic stage. Furthermore, he stated that if the pain is psychological, her suffering is the same because it is real to her. Dr. Gold testified that she was cooperative and seemed genuine and sincere. He did not believe that she was malingering.

Dr. Richard Morse (1990Present)
In March 1990, Mrs. Roig was referred to Touro by her treating psychiatrist at Tulane at the time, Dr. Marilyn Kraus. Dr. Morse, a Psychiatrist and Neurologist who practices in psychiatry, is the director and chief treating physician of the center. After performing an evaluation, examination and noting her history, she was accepted into Touro where she resided for five days a week for one month. She was treated there by a team consisting of various medical specialties. After her discharge, she went to Touro every weekday for three months.
Dr. Morse noted that her spine was curved from the old polio. This was significant because the accident caused back and forth, flexion-extension injury to the spine and some rotational injury to the spine and muscles, which was superimposed on the abnormal spine. Her complaints and observations of swelling, discoloration and numbness of her arm were consistent with RSD and TOS. He stated that she was disabled from driving, has difficulty with stairs, can walk approximately one block, can tolerate riding in a car for two hours and can perform only very light housekeeping. Dr. Morse testified that her sexual activity declined 60 to 70% because of her pain. He stated that she was alert, but extremely worried about the physical pain in her arm, hand, back and leg. He stated that she was not a hypochondriac and that her focus on her illness was needed for purposes of the admission and observations during her month in the program. Dr. Mose stated that Mrs. Roig was depressed and had suicidal thoughts for the first time in her life following the accident. Dr. Morse found this to be significant because she was religious. He stated that the pain isolates her from the family. The doctor testified that Mrs. Roig's husband has had difficulty with her condition because he expected her to be perkier and to get back on her feet. Dr. Morse stated that Mr. Roig was supportive, but not informed as to how to help his wife. He did not fully understand the degree of limitation and fatigue that she suffered. Dr. Morse noted that, like other patients with similar past disabilities, Mrs. Roig strongly compensated for the old polio.
Dr. Morse diagnosed Mrs. Roig with myofascial pain, TOS and RSD (interrelated), cervical pain, lumbar mechanical injury, moderate depression secondary to pain and disability, hip bursitis and post-traumatic stress disorder. His treatment plan for her included decreasing the pain medication, providing anti-depressants to improve sleep and pain, prescribing muscle relaxants and teaching her methods to cope with the pain.
On April 5, 1990, Mrs. Roig was seen by Touro's arthritis specialist, Dr. Derbes. His notes reflect that she was tender over the right shoulder and had a positive Addison's maneuver, which is a test for TOS. (The patient is asked to turn her head while holding her breath. If the pulse disappears from the extremity, the test is positive.) Dr. Morse testified that the positive Addison's test confirmed intermittent TOS, which is when the nerves are compressed by muscle spasms in the neck. He noted that the spasms and compression were apparent from *372 the time of the accident and that the condition was consistent with the type of impact which she sustained in the accident.
Dr. Derbes' report also states that Mrs. Roig showed tenderness over the hip, which was later confirmed as bursitis. He noted that she was guarding her right arm and neck, walked bent over with a limp and used a cane. Her trunk rotation was one half normal. Her neck rotation was severely limited and she showed reduced right shoulder flexion. Dr. Derbes concluded that she had RSD and TOS. In addition, her arthritis tests showed an unusually low immune protein. Although there was no way to know when she developed this condition, extensive use of drugs can cause this condition.
Mrs. Roig was prescribed medications and provided a transcutaneous electrical nerve stimulator (TENS) unit to control the pain. The TENS unit is a battery powered box the size of a beeper.[5] Dr. Morse testified that she was 85% disabled relative to movement when she arrived at the center. She needed help to shower and to cut meat because she had difficulty with object manipulation and repetitive movement with the right hand. The goal was to improve movement of her trunk, mobilize the arm to diminish the pain and to improve her endurance of the pain. Thus, every day she participated in movement therapy, group therapy and stress management. She also participated in occupational therapy and swimming exercises. She was given injections for her hip. Dr. Morse testified that she was not a verbal complainer, but that her physical actions demonstrated her disability. Dr. Morse concurred with the diagnosis of Drs. Palmer and Weisberg. However, he did not review any medical records prior to her admission because he wanted a fresh outlook on the problems.
In regard to RSD, Dr. Morse explained that there are three stages. In the first stage, the traumatic stage, the patient may show color and temperature changes, sweating and burning pain. In the second stage, the dystrophic stage, there may be swelling, skin changes, permanent discoloration and early loss of bone calcium. In the third stage, the reversible tissue changes become irreversible. The muscles shorten and joints fuse, destroying the use of the joint or extremity. He believed that she was in stage one of the condition. He stated that the area had to be mobilized without hurting her because they wanted to stop the progress of the condition. However, even if she improves, any repetitive movement can cause reoccurrence. Dr. Morse also performed numerous stellate ganglion blocks with success. In regard to the placebo block response when she was at Tulane, Dr. Morse stated that because she showed the same response indicates that she is not malingering. He stated that an unconscious response can be learned by the nervous system and that the sympathetic nervous system is trainable. Thus, he agreed with Dr. Weisberg on this point. He thought it showed an objective result that the patient was beginning to gain the capacity to shut out the pain. He also stated that the reaction was a partial confirmation of RSD and referred to other colleagues that look for that response. In addition, a thermogram performed on April 12, 1990 confirmed RSD. He testified that the condition can be treated with medication, nerve blocks, anti-depressants to calm the brain activity, relaxation exercises or any combination of them.
By the end of her stay in the center, Mrs. Roig improved 30%, but was still 70% disabled. She was 100% disabled for work. On discharge on April 20, 1990, her diagnosis was myofacial pain, intermittent TOS, right hip and knee bursitis, early stage RSD, depressive reaction and post-traumatic stress disorder. She was seen again by Dr. Morse for two evaluations in 1992 and she exhibited the same problems.
On cross-examination, Dr. Morse stated that he did not review the previous records when she was admitted because he wanted a fresh look at her problems. He also stated that the placebo block would indicate a patient is malingering only if the patient said nothing was helping and everything was *373 painful. He did not entirely agree with an article in the Neurological Review provided him by defense counsel. He stated that the placebo response could mean that the nerves learned the response, that the saline itself acts as a block because it is an irritant or that the pressure of the fluid stimulates or compresses the nerve to cause response. He agreed that it could also be an hysterical response, but believed that it was more likely a learned physical response. In addition, he testified that it was not unusual to see alternating patterns of cooling and blushing or pallor in the skin. Dr. Morse stated that, in the later stages, nail changes, hair loss or growth, hypersensitivity or loss of sensation such as stocking glove hypothesia and bone changes should be detected, but not in the early stages. However, he stated that the stocking glove condition was usually psychological, but common in RSD patients. He admitted that he did not write any notes showing that he personally observed the alleged color changes or swelling reported by her, but stated that he had seen the symptoms, along with some of the outside doctors. In reference to a report by Dr. Kirshbaum that she did not have TOS, Dr. Morse stated that Dr. Kirshbaum was looking for surgically repairable TOS, not the intermittent type. In addition, Dr. Morse stated that, even though Mrs. Roig does not have a vascular obstruction (compression caused by an extra rib), it does not rule out intermittent TOS.

Dr. Peter Moulder (1990-1991)
Dr. Moulder, a specialist in thoracic and vascular surgery, is a professor at Tulane and Charity Hospital. Mrs. Roig became his patient after her previous vascular surgeon left Tulane. He first treated her in August of 1990. He stated that she had a recurrence of deep vein thrombosis (blood clot) in the right leg and a superficial vein problem. He noted that she had been treated at Ochsner in 1988 for the same problem. After that, she went to see his predecessor at Tulane. This visit indicated the third occurrence of the condition since the accident. He also noted she had been hospitalized for the condition on several occasions. Dr. Moulder testified that thrombosis can occur from trauma, followed by a period of prolonged bed rest or stasis. In his opinion, the problem started with the auto accident in which her vehicle was rear-ended when she had her foot on the brake. She experienced a period of bed rest after the accident. He stated that the trauma from the impact while her foot was on the brake probably caused the thrombosis. In addition, the doctor said that she was an active person, then became sedentary. She then took two lengthy airplane trips for diagnosis purposes, all of which contributed to the formation of the blood clots. The treatment regimen included sleeping with her legs straight but at heart level, wearing external compression stockings when up and taking decoagulant medication which thins the blood. Because of the risk of excessive bleeding from the decoagulant medication, she was provided with a kit containing a needle and K-1 oxide ampules to use in case she started bleeding. On cross-examination, Dr. Moulder testified that the trauma which causes thrombosis is not the kind incurred in the activities which she engaged in prior to the accident. He stated that it needs the type of force from forward impact that she sustained when her foot was fixed on the brake and pushed forward from the impact. The doctor testified that the speed of the impact was not important. The important factor was how the tissue was moved in the impact. Further, he noted that there would not be any pain at that time because the vein changes are subtle. He examined her in 1991, and no sign of the thrombosis was evident, but the doctor stated that does not mean that she did not have thrombosis because the venus study is a non-invasive view of a limited segment of the venous system. He did not agree with his predecessor's notes that it could have been caused by the old polio, uneven walking or the surgery for polio when she was a child. He felt that those comments were only relevant for treatment purposes. Dr. Moulder stated on direct that he had no reason to doubt Mrs. Roig.

Dr. Alonzo Diodene (1990Present)
Dr. Diodene, an orthopedic surgeon, first examined Mrs. Roig on June 1, 1990 at the request of Dr. Derbes at Touro. He examined her for her complaints about her right knee and hip and took over the treatment of *374 her leg. He performed an orthroscopic examination in June, which disclosed that she had degenerative arthritis in the knee. The doctor stated that this can be traumatic in origin, but it can also be caused by daily wear and tear. He stated that if the degenerative arthritis existed prior to the accident, the force of the impact of her foot on the brake, could have aggravated it. He noted that if trauma caused the problem, it was unlikely that she could have walked to the school after the accident. He recognized that Dr. Derbes' notes reflected that Mrs. Roig told him that she was walking in the yard and heard a pop in her knee and that her knee was hurt and swollen afterward.
Dr. Diodene testified that Mrs. Roig will require total knee replacement in the future when she is in her early sixties. That type of surgery lasts approximately ten years, then will have to be redone. The second surgery will not last as long. The cost in current dollars is approximately $12,000 for the doctor's fee, the prosthetics, the hospital and skilled nursing care. In addition, she will need physical therapy and ongoing doctor office visits. Problems following the surgery include loosening of the prosthetic and infection. She now wears a knee brace on his recommendation.
Dr. Diodene also testified that a bone scan taken in September of 1990 showed impaired blood flow to the right hip and right lower extremity which is suggestive of RSD. He also testified that she might be able to perform the work of an LPN, with just the knee problem, if she could rest and change position regularly. Dr. Diodene stated that he thought that the trauma brought the advancing degenerative arthritis to the surface.

Dr. Donald Adams (May 19, 1991)
Dr. Donald Adams, a neurologist, testified that he examined Mrs. Roig on May 19, 1991 at defense request and reviewed the various records, testimony and depositions. He concluded that Mrs. Roig was depressed, but showed no signs of RSD because he felt that she should be showing physical signs of the disorder. He reiterated the symptoms of the disease as it progresses from stage to stage, noting that normal sensations are interpreted as painful. He added that, in stage two, the nails become ridged and/or brittle and hair growth diminishes. In stage three, the pain improves for unknown reasons, the skin thins out and becomes shiny due to a loss of subcutaneous fat, the joints can fuse and freeze and the arm looks atrophied. Dr. Adams stated that the condition waxes and wanes only in the acute stage over a short period of time, but that it never disappears for long periods. Dr. Adams agreed that this is a horrible and painful condition. He also thought that the placebo block supported his opinion and that Mrs. Roig's response to it was psychological. Dr. Adams also stated that he did not believe that Mrs. Roig has causalgia or TOS.
On cross-examination, the doctor admitted that he is not a pain specialist, agreed that studies have shown with drug placebos that one-third of the population will respond to a placebo or to process pain with or without a placebo. He also agreed that Mrs. Roig's response to the placebo does not mean she is a malingerer.

PSYCHOLOGICAL INJURIES

Dr. Rose Marie Eckert (1987Present)
Dr. Eckert, Director of Psychiatry and Counseling at Tulane Student Health Care Center and Tulane University, is also an Assistant Professor of Psychiatry at Tulane. Mrs. Roig was referred to her by Dr. Haddad and Dr. Griffin, Director of the Tulane Department of Psychology. Dr. Eckert treated her personally from September of 1987 to January of 1988, after which, she has been treated by different senior residents in order to reduce the cost. Dr. Eckert continues to oversee the treatment and regularly reviews the treatment records. In addition, Dr. Eckert sees her once a year. Her last visit with Dr. Eckert was February 13, 1992.
According to Dr. Edkert, Mrs. Roig was suffering chronic pain with no progress in getting better. She was crying often, had difficulty sleeping, was gaining weight, was experiencing recurrent dreams and nightmares and generally felt hopeless. Prior to the accident, she felt well, was extremely active, was involved in a career and had no history of psychological problems. Dr. Eckert testified that the accident caused her *375 depression because of the chronic pain and loss of her activities and career. Other stressors in her life after the accident added to the problem. They included illness and deaths in her family and financial problems because her husband lost his job due to an accident. Prior to the accident, her mother and one brother died. In addition, a sister and two aunts underwent mastectomies. However, Dr. Eckert noted that, although she had stressors in her life before the accident, she was coping, but after the accident the chronic pain caused her to lose that ability. Mrs. Roig also suffers from flashbacks to the accident and avoids reminders of the accident.
Dr. Eckert diagnosed Mrs. Roig with major depression and post-traumatic stress disorder. Since her pain has not improved, the depression has continued. She has been treated with various medications, as well as therapy and hypnosis.
After her initial treatment with Dr. Eckert, Mrs. Roig was seen by senior residents. One of those physicians, Dr. Kraus, referred her to Touro. Dr. Kraus diagnosed her with chronic adjustment disorder with depressed mood, which was related to the chronic pain. None of these psychiatrists found any personality disorder or ongoing childhood disorder.
On cross-examination, when informed that defense psychiatrist, Dr. Robert Newman, determined that he found her to have a personality disorder and possible somatoform pain disorder, Dr. Eckert stated that Dr. Newman never saw the patient and that it was inappropriate to diagnose a personality disorder without seeing the patient at length. In addition, she stated that Dr. Newman's diagnosis was contrary to Mrs. Roig's history, to the DSM-3 diagnostic criteria, to her training and all the opinions of the psychiatrists at Tulane. Dr. Eckert stated that patients with somatoform disorder seek attention by focusing on illness. These patients have numerous complaints of illnesses throughout life and seek medical attention. The condition starts in childhood. However, Mrs. Roig does not have the history consistent with somatoform disorder. She has seen many doctors, but on referral. Dr. Eckert stated that this is not unusual in chronic pain patients where the diagnosis is difficult. Although Dr. Griffin, a psychologist at Tulane, also stated that Mrs. Roig possibly has somatoform disorder, Dr. Eckert disagreed. She stated that Dr. Griffin used the MMPI, which does not consider depression. Dr. Eckert pointed out that Mrs. Roig complained of memory loss, which is not substantiated by Dr. Griffin's tests. However, this complaint is common with chronic pain patients because the pain interferes with concentration, but the patient relates it as memory loss. Dr. Eckert testified that even if she had the somatoform disorder, the pain is real to the patient and the patient needs treatment. Regardless, Dr. Eckert believes that the pain is real, not imagined.
Dr. Eckert testified that Mrs. Roig is cooperative, gives her best effort and is not seeking secondary gain. The doctor testified that the accident caused the psychological problems and that if the pain cannot be relieved, she will need long-term therapy. Dr. Eckert stated that Mrs. Roig requires therapy visits either once a week, once every two weeks or monthly for pain management. She needs to continue seeing one of the psychiatrists regularly for consultation and management of medications. Therapy costs $40 to $50 per week and psychiatrist visits cost at least $100 per visit at the reduced fee clinic costs. Private therapy would cost $75 to $125 and a private psychiatrist is at least $100 per hour. In addition, she will require medication.

Dr. Deborah Martinez (1991Present)
Dr. Martinez is the current senior psychiatric resident treating Mrs. Roig. She sees her every two to three weeks and the last visit prior to trial was February 13, 1992. Dr. Martinez concurred with Dr. Eckert in the diagnosis, treatment and cause of the problems. In addition, she noted that not one doctor that had seen her stated that she was a malingerer. Like Dr. Eckert, Dr. Martinez testified that she does not have somatoform disorder.

Dr. Robert Newman
Dr. Newman, a defense psychiatrist, did not examine Mrs. Roig, but reviewed her *376 medical records. Dr. Newman testified that he thought that she has somatoform disorder, which is the expression of stress through the exaggeration of physical complaints. He stated that in her case, it developed from learning to compete at an early age for parental attention. Dr. Newman stated that patients with the condition use the physical complaints for personal and financial gain, but acknowledged that it is initially an unconscious act. Thus, despite not seeing Mrs. Roig and despite the testimony of all of the other treating medical and psychiatric experts, he concluded that she is a malingerer. Dr. Newman noted that Mrs. Roig suffered from ulcers and bronchial spasms from stress in 1982 or 1983 and that she was about to discover in nursing school that the physical demands of the job would be too much for her because of the weakness in her leg from the polio. He recited her post-accident stressors and stated that these were the cause of her depression. He observed that the physical symptom of "stocking glove hyperesthesia" and the placebo response were psychological responses. Dr. Newman noted that she failed to mention the placebo block to every subsequent doctor and that she reported memory loss, which was not substantiated by the tests.
On cross examination, Dr. Newman admitted that he did not think Mrs. Roig was a malingerer before his deposition was taken in 1992. He changed his opinion because he had more records to review after the deposition and he did not know about the placebo block at that time. He said that malingering is a personality disorder.

VOCATIONAL REHABILITATION

Carla Seyler (May 30, 1991 and January 29, 1993)
Carla Seyler (Seyler), a vocational rehabilitation expert, testified that she interviewed Mrs. Roig on May 30, 1991 and January 29, 1993. She tested high, was one of the brightest individuals Seyler had evaluated, was interested in mathematics, science, library work and art work and had skills as a secretary, including computer skills and some medical terminology training. These were extensive transferrable skills. However, Mrs. Roig was totally disabled because of her pain. Seyler testified that Mrs. Roig would have earned between$15 and $17 per hour as an LPN. Seyler noted that Mrs. Roig left a job as an admissions clerk in a hospital years before because of job stress. But, this was not important because she actually moved to a better position. Seyler stated that hospital jobs are by their nature stressful.

Dr. Craig Feldbaum (February 1992)
Dr. Feldbaum, a psychologist and vocational rehabilitation expert, reviewed the various documentary evidence and interviewed and tested Mrs. Roig for three days. He determined that under stress she tends to psychophysiological reactions, an unconscious method of defending herself against anxiety. Dr. Feldbaum noted that Mrs. Roig has a superior intelligence quotient (I.Q.) and her tests scores were above average. He stated that she has transferable secretarial skills and could attend college, absent any physical limitations. Dr. Feldbaum said that she would benefit by rehabilitation counseling and, in fact, could do rehabilitation counseling if she went to college. However, he acknowledged that she was in pain and people in pain have problems focusing, except when specifically asked to focus. Dr. Feldbaum recognized that her injuries were not fully assessed nor her functional disabilities set out. He had not reviewed the trial testimony and would defer to the physicians. Dr. Feldbaum testified that Mrs. Roig did not show any signs of malingering. Instead, she tended toward denial. He noted that people with her psychological condition function fine until confronted with stresses of many different kinds at once, including trauma. He stated that, if she was not symptomatic before the accident, her injuries could make the condition symptomatic and exacerbate it. He said that it complicates the diagnosis and recovery. Dr. Feldbaum agreed that, if Mrs. Roig is totally and permanently disabled, vocational rehabilitation would not help her. He stated that ongoing treatment would be warranted in her case, but if she is disabled for seven years, the prognosis for vocational rehabilitation is not good.

*377 LOSS OF CONSORTIUM
George Roig testified that, as a result of an automobile accident fifteen months after his wife's accident, he was disabled for two and one half years. In his accident, he injured his jaw, back and leg and was operated on for jaw problems in 1990. His knee was operated on in 1989. Mr. Roig testified that his accident disabled him, but he continued to work until it became apparent that his wife required him to drive and otherwise assist her. At that time, he went on disability retirement and now has a reduced income. Mr. Roig stated that his wife has not driven since the accident and he drove her to her appointments. He noted that when the accident occurred the couple had two children living at home. He corroborated that he and his wife had led an active social and church life, attended family enrichment seminars and belonged to the Step Families Association of America. He stated that they had the usual stressors, but their marriage was successful and enjoyable. He noted that before the accident Mrs. Roig was remarkable. Although she had one leg shorter than the other, she ran, danced and played sports. He said that her polio never affected her. He described her condition after the wreck. He stated that she tried unsuccessfully to do housework. He noted that she was always tired. He stated that their sexual relations declined substantially to once every couple of months. He stated that she was not a quitter, but she continued to have pain. He described the chronology of her medical treatment and her decline from active wife and mother to disabled person at home. He stated that the accident devastated their lives and altered their standard of living.
Mr. Roig stated that he began to see a psychiatrist in 1991 because he was having difficulty dealing with his wife's disability and their changed home life. He stated that he did not have any psychological problems from his accident. He further stated that he and his wife continued to love each other and that they intended to support each other.
Mr. Roig testified to the medical bills, which totaled $106,374.18 from date of accident until the first date of the trial on February 2, 1992. From February 2, 1992 through February 3, 1993, she incurred over $25,000 in medical expenses, for a total of $131,565.30. He stated that, from date of the accident until the first phase of the trial on February 2, 1992, Mrs. Roig spent sixty-five days in the hospital, had two hundred visits with the physical therapist, used two hundred eighty prescriptions, made one hundred eight out-patient visits to Tulane, underwent thirty stellate ganglion blocks and interfaced with the medical profession five hundred times. From February 2, 1992 through February 3, 1993, she was in the hospital twice, had twenty-nine lab tests, one CAT scan, one Venogram and two duplex scans, made twenty-three outpatient visits to Tulane and interfaced with the medical profession forty-six times.

ANALYSIS
Plaintiff has the burden of proving by a preponderance of the evidence that the injury was caused by the accident. Tartar v. Hymes, 94-758 (La.App. 5th Cir. 5/30/95); 656 So.2d 756, 758, writ denied 95-1640 (La.10/6/95); 661 So.2d 475. There is a legal presumption of causation when the evidence shows that the plaintiff was in good health prior to the accident, but after the accident, the symptoms of the disabling condition appear and continuously manifest themselves. Dabog v. Deris, 625 So.2d 492, 493-494 (La.1993); Tartar v. Hymes, 656 So.2d at 758; Orgeron v. Prescott, 93-926 (La.App. 5th Cir. 4/14/94); 636 So.2d 1033, 1040. However, the medical evidence must show there is a reasonable possibility of causal connection between the accident and the disabling condition. Dabog v. Deris, 625 So.2d at 493-494; Tartar v. Hymes, 656 So.2d at 758; Orgeron v. Prescott, 636 So.2d at 1040.
In addition, a treating physician's diagnosis and opinions are accorded greater weight than those of the doctors examining the plaintiff for consultation for litigation purposes only. Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042, 1044 (La. 1982); Orgeron v. Prescott, 636 So.2d at 1040. The reason for such preference is that the treating physician is more likely to know the patient's symptoms and complaints due to repeated examinations and sustained observations of the injured person. Bates v. *378 Willis, 613 So.2d 691, 694 (La.App. 5th Cir. 1993); Schilling v. Bigelow Liptak Corp., 427 So.2d 452, 455 (La.App. 1st Cir.1982). This is especially true when the doctor consulted for litigation did not examine the patient, but based the opinion solely on medical records. Orgeron v. Prescott, 636 So.2d at 1040; Martin v. Rollins Services, Inc., 424 So.2d 429, 432-433 (La.App. 4th Cir.1982).
It is a settled rule of law that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Orgeron v. Prescott, 636 So.2d at 1040; Perniciaro v. Brinch, 384 So.2d 392, 395 (La. 1980). When the tortfeasor's conduct aggravates a pre-existing condition, the tortfeasor must compensate the victim for the full extent of the aggravation. Orgeron v. Prescott, 636 So.2d at 1040; Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993).
The standard for the reviewing court to follow to determine whether an award of damages is inadequate was stated by the Louisiana Supreme Court in Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993):
... "[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient," Reck v. Stevens, 373 So.2d 498, 501 (La. 1979) ... In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. See Reck v. Stevens, supra; Cariere v. State Farm Insurance Co., 467 So.2d 867 (La.App. 2d Cir.1985).
The discretion vested in the trier of fact is great. Thus, an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). As the court stated in Youn, "[R]easonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn v. Maritime Overseas Corp., 623 So.2d at 1261; Tartar v. Hymes, 656 So.2d at 756, 760-761.
When the appellate court determines that the factfinder abused its discretion, it can then resort to a review of prior awards to determine the appropriate modification of the award. Theriot v. Allstate Ins. Co., 625 So.2d at 1340. Prior awards under similar circumstances serve only as a general guide. Theriot v. Allstate Ins. Co., 625 So.2d at 1340. In reviewing other awards, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Theriot v. Allstate Ins. Co., 625 So.2d at 1340. When the appellate court is compelled to modify an award, it will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court. Theriot v. Allstate Ins. Co., 625 So.2d at 1340; Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977).
In this case, the evidence was clear that Mrs. Roig led an active life prior to the accident. There was no evidence that she had any physical or psychological problems that caused her to be restricted or disabled in any way. Thus, she is entitled to the benefit of the presumption of causation. In addition, the treating physicians in this case should be accorded greater weight where the record substantiates the injury. After our review of the evidence, we find that plaintiffs proved by overwhelming evidence that Mrs. Roig suffered RSD, TOS, cervical strain lasting several months, thrombosis on at least three occasions and serious psychological damage, leaving her totally disabled and with residual life-long disability and pain. We find that the evidence proved that these injuries were caused by the accident. However, we do not find that her knee and hip complaints are related to the accident.

*379 Analysis of Reflect Sympathetic Dystrophy and Thoracic Outlet Syndrome
Doctors Palmer, Weisberg and Morse diagnosed Mrs. Roig with RSD and TOS based on their own observations of the symptoms, or on the symptoms reported in the notes of Dr. Schiavi and Haddad. Drs. Wiesberg and Morse stated that her response to the placebo block was not indicative of whether or not she had RSD because the nerve system could have been physically conditioned to react after nine other nerve blocks. Signs of TOS, numbness and a positive Addison's maneuver, were noted by several doctors, which is a sign of TOS. Only Dr. Adams, the non-treating physician, disagreed. We find that plaintiffs proved by a preponderance of the evidence that she suffered these conditions as a result of the accident.

Hip And Knee Injury
We do not find that plaintiffs proved that Mrs. Roig's knee or hip was injured in the accident. She did not report any knee problem to anyone until five months after the accident. Although Dr. Schiavi stated that she could have injured the knee from the force exerted on her leg when the impact occurred, he testified that it was unlikely that the pain medication she was taking after the accident would have masked the injury for five months. In addition, Dr. Derbes, four years after the accident, noted in his referral that she related turning her knee and hearing a "pop" and her tests showed degenerative arthritis in the knee. Furthermore, Dr. Diodene stated that it was unlikely for Mrs. Roig to have been able to walk as far as she did after the impact if the knee was injured at that time.

Other physical damages
The evidence shows that Mrs. Roig suffered a cervical strain that may have resolved, but is intermingled with the other two diagnoses of RSD and TOS. We also find that the evidence showed that she suffered thrombosis as a result of her inactivity from the pain following the accident. There was no contrary evidence on this point.

Psychological Damages
Mrs. Roig's treating psychiatrists, Dr. Eckert, Dr. Martinez and the records of the other treating senior residents, prove that she is suffering from depression secondary to the chronic pain condition and post-traumatic stress disorder. None of the treating psychologists or psychiatrists or treating medical doctors concluded that she had somatoform disorder or that she was malingering. These conclusions were made solely by defense witnesses, psychologist Dr. Feldbaum, whose testing indicated the somatoform condition, but did not account for the depression, and psychiatrist, Dr. Newman, who was the only expert to conclude that she was malingering, despite never examining or interviewing her. Further, the evidence showed that even if she has somatoform disorder, it did not manifest itself before the accident. All of her pre-accident illnesses were real illnesses, for which she received treatment and continued on with her life. Nothing disabled her until the chronic pain following the accident. Defendants tried to show that the depression was caused by other stressors in her life before and after the accident, including deaths, major illnesses in her family and her husband's accident resulting in decreased income. However, she suffered many of the stressors before the accident and functioned fine. After the accident, the stress of the chronic pain was the trigger that caused her to stop coping. Thus, we find that she is entitled to compensation for her depression and post-traumatic stress disorder.

PAST AND FUTURE GENERAL DAMAGES
The trial judge awarded plaintiff an in globo amount of $40,000, which apparently included past and future special and general damages. Given the serious nature of the damages and the residual effects in this case, we conclude that amount is extremely inadequate and an abuse of the trial judge's discretion. Following that determination, in regard to general damages, we reviewed the jurisprudence searching for similar injuries. We find that the lowest reasonable amount that the trial judge could have awarded in *380 past and future general damages for all of these injuries is $300,000. We amend the judgment to that effect.

PAST AND FUTURE MEDICAL EXPENSES
We find that plaintiffs are entitled to past medical expenses. From the total amount of past medical expenses claimed, we have subtracted the cost of hip and knee surgery and one half of the cost of the brace, special shoes and shoe lift, which are attributable to the hip and knee problem. Therefore, we calculate that plaintiffs are entitled to past medical expenses in the amount of $120,380.74.[6]
We find that plaintiffs are entitled to future medical expenses, which are composed of psychological therapy, psychiatric supervision, drug costs and future shoulder surgery. We award future psychological therapy, once every two weeks for five years, of $5,200[7] and thereafter, once every month for the rest of Mrs. Roig's life, of $15,796.80.[8] Because Mrs. Roig will require future monthly psychiatric supervision, we award her $45,492.[9] We award future drug costs in the amount of $3,600. We award the cost of future shoulder surgery of $3,000 and future physician office visits of $10,614.80.[10] Her future medical expenses equal $83,703.60, which we discounted at 6% for a total of $78,681.38. Therefore, her total past and future medical expenses is $199,062.12.

PAST AND FUTURE LOST WAGES
Plaintiffs assert that Mrs. Roig's lost wages should be calculated on the amount which she would have earned as an LPN ($17.00 per hour). However, we find that there is no probability that she would have actually earned $17.00 per hour, but for the accident. Nevertheless, we find she is entitled to an award for lost past and future wages.

ECONOMIST
G. Randolf Rice, plaintiffs' economist, testified about Mrs. Roig's past and future lost wages. At the time of the report, she was 42.87 years old with a life expectancy of 37.91 years and a realistic work life expectancy of 14.28 years. Her past lost wages are $49,500.[11]
In regard to future wages, Dr. Rice noted that the current LPN wage was between $17 and $20 per hour, working a 40 hour week, without special shift work and that the LPN market tended to increase rapidly. Using a work life of 14.28 years, Dr. Rice calculated Mrs. Roig's future lost wages at $4.50 per hour to be $133,660.80 and at $17 per hour to be $438,748. We disagree with Dr. Rice's calculations. We arrive at a future wages figure by considering her lost wage of $4.50 per hour and her probable LPN wage of $17 per hour. Since she will not make less than $4.50 per hour, we average the figures by subtracting $4.50 from $17 and get $12.50 per hour that she probably will make. Also, since other variables would probably reduce her future wages, we divide that figure in half to arrive at $6.25 per hour.[12] We find that the present value of Mrs. Roig's future lost wages is $174,501.60. Her total past and future lost wages are $224,001.60.

LOSS OF CONSORTIUM
Finally, we find that George Roig is entitled to an award for loss of consortium. Both plaintiffs testified to the devastating effects that her injuries had on their lives. Their sex life diminished. She isolated herself due to the pain. He had difficulty understanding *381 and dealing with her physical and mental distress. He was forced to go into counseling to help him cope with the changes in his wife and their lives. She was no longer able to do housework or to accompany him to social and church events. Their lives became restricted and their activities limited. Based on uncontroverted evidence, we find that the trial judge was manifestly erroneous in failing to award George Roig an amount of compensation for loss of consortium. We find that an appropriate award for loss of consortium is $20,000.
Accordingly, the judgment of the trial judge is hereby amended to increase the award from $40,000 to $723,063.72, which includes past and future general damages of $300,000, past and future medical expenses of $199,062.12 and past and future lost wages of $224,001.60. In addition, the judgment of the trial judge dismissing the claim for loss of consortium is hereby reversed and are awarded in the amount of $20,000. The trial court judgment is otherwise affirmed.
Costs of trial and appeal are to be paid by appellees.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART AND AFFIRMED AS AMENDED.

REHEARING GRANTED
We have reconsidered our original opinion in light of the application for rehearing filed by defendants. However, we find no error in our analysis. We grant the rehearing for the sole purpose of correcting and clarifying certain statements in our opinion. Nonetheless, the correction and clarification do not change our opinion.
In our opinion, we state that "Dr. Schiavi stated that it was not unusual to find `stocking glove hypesthesia' on an entire limb." Dr. Schiavi actually testified that it was "not usual." However, plaintiff nevertheless exhibited the symptom when examined by Dr. Schiavi.
Next, we note that Dr. Moulder indicated plaintiff took two plane trips "for diagnosis purposes", whereas plaintiff took several plane trips, two of which were for family reasons. This has no affect on his diagnosis because the reason for the trips is irrelevant. What was relevant is that long plane rides contributed to the thrombosis. This result was an outcome of the injury.
In regard to the placebo tests referred to by Dr. Adams, we find that the testimony we cited was correct. The tests with placebos involving drugs show response with or without a placebo. Although Dr. Adams did state that controls for diagnostic medical tests are different, other witnesses testified that plaintiff's placebo response was not an indication of falsification of the results.
Finally, we agree that Dr. Griffin, a psychologist, also stated in his report that plaintiff had somatoform disorder. However, Dr. Eckert, the treating psychiatrist, vehemently disagreed with this in detail. Based on Dr. Eckert's diagnosis, analysis, plaintiff's history and the types of tests given to plaintiff, it was not a reasonable inference of fact to find that plaintiff suffered from that condition. Even had we done so, defendant takes his victim as he finds her and is responsible for the consequences of his act.
Accordingly, we affirm our original opinion.
NOTES
[1] The record contains twelve volumes and numerous exhibits.
[2] The trial judge did not issue reasons for judgment and was not requested to do so by any party.
[3] Plaintiffs' twelve specifications of errors are summarized for brevity.
[4] Dr. Haddad's testimony was presented by deposition. He was deceased at the time of trial.
[5] Electrodes are placed on the skin over the area supplied by the nerves from the spinal cord corresponding to the painful area. Electrical currents are fed into the spinal cord along the nerve area supplied by the nerves to control the pain.
[6] $131,565.30$10,591$593.56 = $120,380.74.
[7] $40 per visit × 26 visits per year × 5 years = $5,200.
[8] $40 per visit × 12 visits per year × 32.91 years = $15,796.80.
[9] $100 per visit × 12 visits per year × 37.91 years = $45,492.
[10] $35 per visit × 8 visits per year × 37.91 years = $10,614.80.
[11] $4.50 per hour × 40 hours × 52 weeks × 5 years, 15 weeks (from date of termination of employment in October of 1986 to date of trial of February 24, 1992) = $49,500.
[12] $17 per hour$4.50 = $12.50 × 1/2 = $6.25 per hour × 40 hours per week × 52 weeks × 14.28 years of work life = $185,640 discounted by 6% = $174,501.60.